## No. 9846.

THE STATE OF LOUISIANA EX REL. THE ATTORNEY GENERAL VS. HENRY L. LAZARUS, JUDGE OF CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS, DIVISION "E."

Suit instituted under the original jurisdiction of the Supreme Court, by virtue of Article 200 of the Constitution of this State, by the Attorney General, on the information of fifty citizens and tax-payers, for the removal of the defendant from office, for non-feasance and mal-feasance, favoritism and oppression in office, gross misconduct and incompetency.

*Held* by the Court:

That the charges of mal-feasance and gross misconduct have been fully established against the defendant by the evidence.

That a district judge has no right or authority whatever to employ experts at the expense of litigants, or of a succession, or of a minor, to examine and report on the pleadings or evidence in any record, when such examination is to be made by the judge himself.

That the allowance of the fees to such experts made by this defendant, in the matter of the succession of Quiazzaro, was not only an act of mal-feasance on the part of the judge, but it was also an act of spoliation.

That the minutes of all courts of record throughout the civilized world are uniformly recognized as evidence of the very highest rank, and never allowed to be contradicted by parol testimony, unless perhaps under an allegation of fraud or forgery. In our jurisprudence the minutes of courts have always been clothed with an authenticity which borders on sanctity.

State ex rel. Attorney General vs. Lazarus.

That the minutes of a court are in the nature of a citation and need not be offered in evidence, as they make proof of themselves.

That it is unlawful and unwarranted for a judge to assume the personal administration of a fund belonging to litigants, or to a succession. or to a minor.

That this defendant, having assumed such personal administration of the funds of the Quiazzaro Succession, has also assumed, in consequence, the burden of proving clearly that a proper and lawful use has been made of those funds; that he has completely failed in such proof and accounting; that his acts in the premises show glaring malfeasance on his part.

Duties of the minute clerk examined and defined.

Strong condemnation by the Court of the customary omission of defendant to cause the minutes of his court to be read aloud by the clerk, and to be signed by himself.

That it is not necessary, under Article 200 of the Constitution of this State, for the purpose of the removal of a district judge, that the non-feasance, or malfeasance, or gross misconduct charged, should, as a condition precedent, be proved to be criminal or corrupt.

Malfeasance defined.

That it was the intention of the framers of the present Constitution of this State to leave the application of Article 200 to the sound and legal discretion of the Supreme Court; and that, by the decree of the latter, none but able, conscientious and irreproachable judges should be retained on the Bench in the State of Louisiana.

Difference between the provisions of the Constitution of the United States and the present Constitution of the State of Louisiana, for the punishment of impeachable offences.

---

*M. J. Cunningham,* Attorney General, *Thomas J. Semmes, B. R. Forman* and *F. C. Zacharie,* for the Relator.

*Bayne & Denègre, Wm. F. & D. C. Mellen, Gus. A. Breaux, W. S. Benedict, Sam. P. Blanc, Max Dinkelspiel, Geo. H. Braughn, E. M. Hudson, Jonas & Nixon,* and *Farrar & Kruttschnitt,* for the Respondent.

---

The opinion of the Court was delivered by

Poché, J. This proceeding, brought for the removal of the respondent from the office which he now holds, is predicated on two articles of the State Constitution, which read as follows:

Art. 196. "The Governor, Lieutenant Governor, Secretary of State, Auditor, Treasurer, Attorney General, Superintendent of Public Education, and the judges of all the courts of record in this State, shall be liable to impeachment for high crimes and misdemeanors, for nonfeasance or malfeasance in office, for incompetency, for corruption, favoritism, extortion or oppression in office, or for gross misconduct or habitual drunkenness."

Art. 200. "For any of the causes specified in Article 196, judges of the courts of appeal, of the district courts throughout the State, and of the city courts of the parish of Orleans, may be removed from office by judgment of the Supreme Court of this State, in a suit instituted by the Attorney General or a district attorney in the

name of the State, on his relation. The Supreme Court is hereby vested with original jurisdiction to try such causes; and it is hereby made the duty of the Attorney General, or of any district attorney, to institute such suit on the written request and information of fifty citizens and taxpayers residing within the territorial limits of the district or circuit over which the judge, against whom the suit is brought, exercises the functions of his office. Such suits shall be tried, after citation and ten days' delay for answering, in preference to all other suits, and wherever the court may be sitting; but the pendency of such suit shall not operate a suspension from office." * * *

The charges against this respondent are: nonfeasance and malfeasance, favoritism and oppression in office, gross misconduct and incompetency, contained and detailed in eight specifications.

1st. The first specification is substantially as follows: That the defendant, without any color of law or right, and in violation of his duty as judge, illegally obtained, on the 3d of March, 1882, possession of the sum of $291 54, of a fund belonging to the succession of Nicholas Quiazzaro, and that he has never accounted for said sum to the heirs, nor to any heir or tutor of the heirs or other representative of the succession.

It is averred that said sum was the balance of a fund belonging to said succession, and placed, under orders of the court, in the custody of Ben Onorato, auctioneer, who had sold the property whence the fund proceeded; and that it was drawn from the custody of said B. Onorato by means of an order of court issued by the defendant, and by him entrusted for execution to one Charles E. Sel, who was instructed to, and did, bring and deliver to the defendant the aforesaid sum, being the balance of the fund hereinabove described.

In his answer to this specification the defendant gives a detailed history of the proceedings through which his court obtained control of the funds belonging to the succession of Nicholas Quiazzaro.

It appears from his statement and from evidence in the record that Quiazzaro died in September, 1868, leaving a considerable estate, which, after administration, went into the hands of his surviving widow, as community property, belonging to herself for one-half, and the other half in equal shares to her three minor children, Ernestine, Gilbert and Arsene Adelaide Quiazzaro, the latter having been born a few months after the death of the father. The administrator's account was presented in 1870, and was accepted by the widow in an authentic act, on September 14, 1870. It showed clear assets amounting to the sum of $22,649 97.

On the judicial demand of two of her children, who had then become of age, the widow Quiazzaro, who had in the meantime contracted a second marriage, presented to the court on the 28th of May, 1880, an account of her tutorship, which showed her indebtedness to her children to be $3651 11 to each, and which was homologated.

At the organization of the present Civil District Court, the record of the succession of Nicholas Quiazzaro was allotted to the division to which the defendant had been appointed. And shortly thereafter, the widow of Quiazzaro, who had been abandoned by her second husband, presented a petition to the court for the purpose of being judicially authorized to sell, free of the minor Arsene Quiazzaro's mortgage, two pieces of immovable property which she owned in this city, and which she had purchased in the year 1869, at the aggregate price of $10,000.

Considering the amount of taxes due on the property, its dilapidated condition and its greatly depreciated value, the family meeting recommended and the court ordered a sale of the property. No adjudication having been made at the first offering, the application for a sale was renewed, and after considering the recommendations of a second family meeting, and a report made to him by Joseph Garidel, whom he had appointed as an expert to ascertain the amount of taxes due by, and exigible against, the property, the judge rendered the following decree of date of April 5, 1881:

"It is ordered, adjudged and decreed that the *proces verbal* of the 12th of February, 1881, be homologated and approved, and the recorder of mortgages directed to erase and cancel the general mortgage in favor of Arsene Adelaide Quiazzaro, in so far as the same affects or operates upon the property described in the petition and *proces verbal* of the date aforesaid.

"It is further ordered, adjudged and decreed that the property described as aforesaid be sold for cash, by Ben Onorato, auctioneer, to the highest bidder, after usual advertisements prescribed by law.

"It is further adjudged and decreed that a *proces verbal* of the sale be filed in court, and the price realized from said sale be deposited in the judicial depository, there to await the order of the court for the payment of taxes and charges, upon the court's approval.

"It is further ordered, adjudged and decreed that Henry Bier be authorized to settle the taxes due on said property; first filing a statement at what rates said taxes can be settled, and subject to the court's approval.

"It is further ordered, adjudged and decreed that any surplus re-

maining from the amount realized from said sale, after payment of the taxes, charges and costs due by said property, up to the amount of the general mortgage in favor of Arsene A. Quiazzaro, be invested in State registered bonds, under Act of 1857 and Article 348 of the Civil Code

"And it is further ordered that a fee of fifty dollars be taxed in favor of Jos. Garidel, as costs."

In obedience to that order the two pieces of property were sold, and realized together the sum of $2025, of which $205 remained in the hands of Onorato, and were subsequently disbursed by him under orders of the court, and the balance, $1820, was deposited in the Branch Depositary of the State National Bank, which had previously been selected as the judicial depository of the Civil District Court.

From the books of the bank it appears that the account was opened and was kept under the following title and style : " Ben Onorato, administrator succession Nicholas Quiazzaro, No. 824 Civil District Court, Division E, subject to order of court."

The deposit was made on June 17, 1881, from which date to the 10th of February, 1882, numerous orders were rendered by the court directing the disbursement of the fund for various purposes; the bank paying out on Onorato's check, accompanied by the order of the court, calling for an amount corresponding with that of the check.

The orders included between these two dates may be classified as follows :

For all State and city taxes due on the property............. $966 85
For costs incurred for the sale, including the auctioneers' com-
       mission, advertisements, two family meetings, attorneys'
       fees, court costs, stamps, express and appraisers, etc....    469 35
For Garidel's fees as expert, and fees of other experts........    150 00

Amounting together to...................................$1586 20
And leaving a balance out of the fund of....................    438 80

Now, the answer avers that subsequently additional payments of taxes and costs were made, and the minutes of the court and the books of the bank show that an order for the disbursement of $147 26, purporting to be for taxes still unpaid, was made on the 10th of February, 1882, which left to the credit of the fund $291 54. It is then averred in the answer that on the 2d of March, 1882, the defendant was reminded by his minute clerk, F. A. Luminais, since deceased, of the existence of that balance, which he estimated at about $200, and which, he suggested, should be invested in bonds, in compliance with the previous order of the court. Whereupon, the following morning the defendant

made arrangements with a friend of his, Henry Bier, a broker in bonds, for the purchase of bonds, without charging any commission therefor.

On the same day, the 3d of March, 1882, he issued the following order:

"More than six months having elapsed since the sale of the property, in the above succession, and no opposition to the distribution of the same having been made, and no one claiming any interest in the proceeds of said property other than the minor Quiazzaro:

"It is ordered that the proceeds of said property belonging to the succession of Quiazzaro be invested in State Consols, or bonds of the State known as 'Baby Bonds,' and that said bonds be registered by the Auditor of the State, under Art. 348 of the Civil Code."

On presentation of this order to Onorato, on behalf of the judge, by Charles E. Sel, then a deputy clerk in the Civil District Court, the former declined to honor it for want of sufficient precision. On the report of Sel of such refusal to the judge, the latter added, after the words "Civil Code" and over the signature of the deputy clerk who had made out the certified copy of the order, the following words: "And that B. Onorato be ordered to pay the same over to make the said investment." The order thus amended brought out of Onorato a check of $291 54, which was cashed by Sel, who handed the roll of money to the judge, some time after 3 o'clock p. m. of the same day.

The answer then avers that without counting the roll of money, the judge handed it to his minute clerk, Luminais, with instructions to have the same invested in "Baby Bonds" through Henry Bier.

On subsequent inquiry of Luminais, the judge was informed that the bonds had been bought, and were in the possession of Bier, from whom they were obtained by Sel, who delivered them to the judge, by whom they were handed to Luminais, the minute clerk, with instructions to paraph them for non-negotiability, and to deliver them to John Lemonnier, the counsel of the tutrix, also since deceased. And it is then averred that from that time, about the 6th of March, 1882, the defendant never more saw these bonds to this day, and never heard of them until the month of April, 1886, on the occurrence of certain events to be hereafter referred to.

With the exception of two or three instances, the foregoing recital, taken from the answer and from the evidence, contains a statement of the undisputed salient facts involved in the discussion of the first specification of relator's petition.

As a result of the answer and of the voluminous evidence which was

introduced on allegations therein contained, the original pleadings have been considerably enlarged, and the distribution of the whole fund brought into court, as well as the manner of making the distribution, has been discussed by counsel on both sides, as a vital issue on this branch of the case.

It appears from the record that every order, made for the purpose of drawing money from the Quiazzaro fund in the judicial depository, was rendered *ex parte* without notice on, or hearing from, the tutrix, the under-tutor, or any other party who may have had any interest in its proper distribution.

This course is charged by relator's counsel to be in direct violation of the rules adopted by the five judges, including the defendant, composing the Civil District Court for the Parish of Orleans, and to be of itself a malfeasance and a gross misconduct. The twenty-fourth of these rules was adopted in furtherance of Article 133 of the Constitution, and of Act 33 of 1880 of the Legislature, of Louisiana.

That rule, which treats of the judicial depository, contains, among others, the following provisions:

" 3. Drafts or orders on the bank for the payment of money or delivery of property, shall be made to the order of the person entitled thereto, or his attorney, duly authorized, and shall specify in what particular suit or on what account the money or property is to be paid out or delivered.

" 4. Such orders or drafts shall be drawn by the officer, pursuant to an order of the judge of the division having control of the case, wherein the money or property has been received.

" No order, unless by consent, in any pending cause, shall be granted except on regular notice or order to show cause, duly served on the attorneys of all parties who have appeared therein."

As the property which produced the fund was the personal property of the widow Quiazzaro, it is apparent that a compliance with the rule would have required her consent in her individual capacity, or in default thereof, a notice on her to show cause, in •order to legalize every order for the payment of taxes, of costs, of experts, and of all other disbursements down to the balance, or residue, which accrued to the minor ; and that the order for the investment in bonds of that residue should have been preceded by notice on Arsene Quiazzaro.

But nothing of the kind was done, and no disbursement was made, in compliance with the rule. The order for the payment of State taxes was not in favor of the tax collector, but the money was drawn and disbursed by Luminais, the minute clerk. The order for city

taxes was not in favor of the City Treasurer, but the money was drawn by the Civil Sheriff of the parish of Orleans, who settled those taxes, although in the order or decree of the 5th of April, 1881, Henry Bier had been entrusted with that duty.

Without expressing any opinion as to the alleged malfeasance which may result from the course pursued by the defendant, the legal mind must conclude that the judge thereby assumed the administration of that fund on his own responsibility, and that in law he must be held to a strict account of his administration.

Both in his answer and in the evidence which he has introduced, the defendant has admitted that obligation, and he has endeavored to account for the fund which he had disposed of, not a dollar of which has, however, been shown to have been received by the acknowledged owner of the residue, after the payment of taxes and other legal charges, the minor Arsene A. Quiazzaro or her legal representative. The result of his administration was a total disaster to the Quiazzaro family.

The payment of $966 85 for State and city taxes, of $469 35 as law charges and costs incidental to the two offerings and to the sale of the property, although excessive, as well as the sum of $20, paid to John Dufour for a valuable report on the condition of the property as to taxes due thereon, is legally accounted for, and such a showing would *pro tanto* be justified in an administrator or tutor.

But the same can surely not be said of the amounts allowed to Joseph Garidel, the chief expert, and to a following of minor experts whose mission seems to have been to perform the duties which were incumbent on the judge himself.

The decree under date of February 23, 1881, which appointed Garidel, who was then the minute clerk of the Court of Appeals, as expert in the premises, and under which he qualified by taking an oath, restricted his authority to report to the court "the amount of taxes and charges due on the properties now owned by Elizabeth Buras, natural tutrix, and on which a general mortgage rests in favor of the minor, Arsene Adelaide Quiazzaro."

As it appears from the record that the statement of taxes due was complicated and required special knowledge and diligent search, the appointment of a competent expert to that end can be justified in law. C. P. 441, 442, 443. But it appears from the defendant's evidence that Garidel was not the proper person for such a duty, and that the task was performed by two other distinct and competent experts, John T. Dufour and Wm. C. Cole, who were paid for their services $45, not out

of the allowance made to Garidel, but out of the funds accruing to the minor under the original order of the court.

From the record it appears that the scope of the chief expert's authority grew with time, and that he gradually assumed the function of a general adviser of the Court. With few exceptions, the matters contained in his reports, were a review or synopsis of the pleadings and proceedings in the succession of Quiazzaro, which had been finally settled and wound up since 1870; of his views of the evidence; of the contingent rights of certain parties; and an indorsement of the reports of subordinate experts. During all the time covered by these reports, the widow Quiazzaro, who had been legally retained as natural tutrix in anticipation of her second marriage, was before the court by her counsel, John Lemonnier, who received a fee of $180, from whom the judge could have required and obtained all necessary information to shape his course in dealing with the matter in hand. That was simply to legalize the sale of the property of the tutrix, free of the minor's general mortgage, to settle the taxes and law charges, and to secure the residue for the minor. There was no necessity of investigating the previous condition of the Quiazzaro succession further than to ascertain the amount which the tutrix owed to the minor. But the investigation of such matters was peculiarly and exclusively within the judge's province. A district judge has no more right or authority to employ experts, at the expense of litigants, or of a succession, or of a minor, to examine into and report on the pleadings or evidence in any record, than would have the judges of this court to have similar examinations at a like expense, made of the transcripts which contain the matters submitted to their review.

Yet it appears that out of the very small pittance accruing to the Quiazzaro minor, the expert Garidel was allowed fees aggregating $95 for researches and reports reaching far beyond the scope of his authority, under the very text of his appointment, and that between the experts together they received as fees $150. Such an allowance was not only an act of malfeasance on the part of the judge, but it was an act of spoliation.

The next disbursement in the order of discussion is the sum of $147.26, covered by the order of February 10, 1882, which order is in the following words: " On account presented for taxes due on the property sold in the succession of Nicholas Quiazzaro and still unpaid, it is ordered that the same, amounting to the sum of $147 26, be paid by B. Onorato, administrator, and charged to said succession."

That is followed on the same day by an order which reads:

State ex rel. Attorney General vs. Lazarus.

"Succession of Nicholas Quiazzaro," * * * "It is ordered by the court this day, that B. Onorato, administrator, do render an account of balance of funds in his hands belonging to the succession of Nicholas Quiazzaro."

From the report of Onorato and from the books of the judicial depository it appears that the order was presented and paid; but nothing shows to whom the funds were delivered, as Onorato's checks in this matter were all made payable to "Bearer." The clerk of the bank testifies that the check and accompanying order were returned to Onorato on the subsequent occasion that his bank book was balanced, which was on the 14th of the same month; but Onorato testifies that notwithstanding a prolonged and a diligent search among his papers, he has been unable to find that particular check and the accompanying order, or any of the checks or orders previously executed in this matter. Hence, the record fails to connect the order with any person as the recipient of the money which it called for.

On the other hand, it is in proof, and, indeed, it is conceded on both sides, that no taxes were then due on the property, and that none were paid in the year 1882.

In his testimony, the defendant stoutly repudiates the legal existence of both orders, positively denies that he has ever issued either, and intimates his belief that both were fraudulently interpolated in the minutes of that day by his minute clerk, F. A. Luminais, since deceased, in whose hand-writing they were entered.

In argument, the defense advanced the theory that Luminais had forged both orders, had collected and appropriated the amount called for by the first order, and that having obtained possession of the bank book, he had it balanced on the 14th of February, thus obtaining the spurious order, which he destroyed with a view to escape detection.

But that theory finds no support either in the evidence or in any of the equities or circumstances of the case, when brought to the test of human experience, or of the known springs of human action.

In the first place, the defendant admits the authenticity of the orders, in his sworn answer, from which is culled the following averment:

"Additional payments for taxes and costs were subsequently made therefrom, and on February 10th, an order was entered directing Ben Onorato to render an account of the balance of the funds in his hands belonging to the succession of Nicholas Quiazzaro. This order was not complied with, possibly because it does not seem to have been served on him."

In the next place, the minutes of all courts of record throughout the civilized world are uniformly recognized as evidence of the very highest rank, and never allowed to be contradicted by parol testimony unless, perhaps, under an allegation of fraud and forgery. No such charge is made in the pleadings in this case; on the contrary, as far as the answer goes, the minute entries are held up as correct.

In our jurisprudence the minutes of a court have always been clothed with an authenticity which borders on sanctity.

In the case of Williams vs. Hooper, 4 N. S. 176, this Court refused to entertain parol testimony to show that a new trial had been granted in a cause where the minutes were silent on the subject. Speaking of judicial records and minutes, the Court said: "The object the Legislature had in view, in directing them to be recorded, was to avoid the danger of trusting to the memories of men to prove them. That which was attempted here was still more dangerous. It was not only to establish, from the recollection of witnesses, the judgment of the court, but do so in contradiction to what was written. It is far better to bear with cases of individual hardship than violate a rule, the preservation of which is so important to the best interests of society."

The same views are expressed in the cases of Nolan vs. Bobin, 12 Rob. 531, and State vs. Fuller, 14 Ann. 726.

In the latter case the Court held that minutes were in the nature of a citation and need not be offered in evidence, as they make proof of themselves. In the instant case the most wonderful feat on record is attempted: the denial of the existence of an order by a judge, when the minutes of his own court show its entry, when a like showing is made by docket entries made by a person entirely different from the minute clerk, taken from the original order itself; and all that in the face of an admission of the order in his own pleadings in a cause to which he is a party.

In the case of State ex rel. Railroad Company vs. Henry L. Lazarus, judge, 34 Ann. 1117, the present Bench had to deal with a similar contention urged by this very respondent, who therein denied the verity of the minutes of his court. The Court held: "However great our confidence in any statement that might be submitted by a judge, nevertheless our knowledge of the facts must be derived from the record, and we can only take cognizance of them as there shown."

But he says that he scarcely ever signed his minutes, and never caused them to be read, adding that neither formality could deter a dishonest clerk from making false entries. This, if true, is a sad blow at the legal efficacy and binding force of judicial proceedings.

State ex rel. Attorney General vs. Lazarus.

The following is taken from his testimony on that point:

Q. Do you sign your minutes, judge?

A. No, sir.

Q. Do you have your minutes read every day in open court?

A. No, sir; there is only one judge in the building that does it. I don't think I was ever in Judge Houston's court when it was done, but I understand that he has his minutes read to him every morning.

Q. Is there any rule about it?

A. No, sir.

In his answer to the last question the defendant commits a grievous error. There is a wise and a salutary rule of court on the subject. It reads thus: "The minutes of each day's proceedings shall be signed by the judge." (Rule V.) A compliance with that far-reaching provision by the judge would place it beyond the power of the most dishonest of clerks to interpolate in the minutes any order which did not emanate from the court.

And if it be true that any number of the judges of the Civil District Court, or of any other court in the State, omit to sign their minutes, or to cause them to be read in open court every day, it is sincerely hoped that the complication which is now under discussion will suggest the propriety of a return to a practice which will afford great and equal protection to judges, litigants and their attorneys, and to minute clerks themselves.

But if it be true that Luminais did rob the fund out of that sum of $147 26, by forging an order which he subsequently destroyed, it is difficult to appreciate the motive which could have prompted him to spread the order on the minutes, which would at any time afford conclusive proof of his guilt. And if he was guilty as charged, it is impossible to conceive why, on the 2d of March, as shown by the answer and by the testimony of the defendant, he should have reminded the judge of the propriety of investing the minor's residue in bonds. Thieves are not in the habit of recurring to subjects and of agitating questions which are intimately connected with one of their recent operations, an investigation of which would inevitably lead to their detection and conviction. As a rule their memories are defective in the premises.

This complete demolition of the theory advanced by the defense, leaves the respondent judge in the attitude of utterly failing to account for a disbursement which he had authorized and directed, and for a purpose which he himself proves to have had no existence or reason. Hard indeed would it be to prove more glaring malfeasance.

The question now recurs to the disposition made of the sum of $291.54 as the final balance of the fund remaining in the judicial depository.

The pivotal testimony on that point is that of Charles E. Sel, then a recording clerk in the Civil District Court, and subsequently a notary public, exercising his functions in the office of two of the defendant's counsel in this case.

His testimony was taken by consent of parties, at the side of his dying bed, a circumstance which gives great weight to his statements. He was entrusted by the judge with the execution of the order of the 3d of March, 1882, and he states in substance what is related of him in the defendant's answer hereinabove referred to.

But he states in addition that he was instructed by the judge to *cash* the check which he would receive from Onorato, and to *bring the money to him* (the judge). That he counted the money as it was delivered by the paying teller, and that he handed the identical amount received by him to the judge in the court-room after the court had adjourned, the amount being $291.54 as shown by the check of Onorato, attached to the order of the court, and produced in this case by the judicial depository in answer to a *subpœna duces tecum*.

He then states, not positively, but as an impression, that the judge put the money in his pocket.

He further testifies that on the 6th or 7th of the same month, he was called by the judge and sent to Henry Bier's office for the bonds which the latter had purchased for the judge, and that he brought the package of bonds to the latter, having noticed, from a memorandum attached to the package, as customary with brokers, that the sum invested in bonds was not equal or equivalent in amount to the money which he had handed to the judge on the Friday previous.

He then swore, and reiterated under a very rigorous cross-examination, with the corroboration of two unimpeached witnesses, that the judge then and there asked him to retain the bonds, of which he was made the custodian, on a promised compensation of five dollars, and that he then had possession of the bonds for several days, until they were called for by the judge, at which time he went for them at his house and brought them to the judge, from which time he had not heard of them until the troubles of July, 1886.

Now, from the books and from the testimony of Henry Bier, it appears that the amount which he bought in bonds was $330 at 60½ cents costing $199.65, which is all the money which he received in the transaction. But both himself and his bookkeeper entirely fail to remember

by whom the funds were brought to the office, or how they reached there. A most unfortunate incident which has added one of the most serious complications to the innumerable mysteries which cloud this controversy.

Bier's books show that the entry of the transaction was in the name of the " succession of N. Quiazzaro," in keeping with the style of all entries made in the orders, the minutes, and the dockets of the court from August, 1880, to the end; and it is truly deplorable that neither Bier nor his bookkeeper can now remember from whom the money invested was handed, or the instruction as to the style of entry, given.

Any information on that score would have solved the mystery of the disappearance of the sum of $91 89, the difference between the amount received by the judge and the amount actually invested in bonds.

No denial has been made, nor has even an intimation of a doubt been thrown out, touching the precise amount of money which Sel delivered to the judge. In this connection the defendant testifies : " I had no occasion to count the money. I took it for granted that what Mr. Onorato gave to Mr. Sel, Mr. Sel gave to me, and that I gave Jack. I gave Jack exactly what Sel handed to me without disturbing the package at all. I had every confidence in Mr. Sel; every confidence in Mr. Luminais."

It is, therefore, perfectly safe to conclude that the amount of money received by the judge from the judicial depository, as representing the balance to the credit of the Quiazzaro fund, was the sum of $291 54. It is equally clear that the legal effect and result of such conclusive proof is to throw the burden on the defendant to account for the sum thus received. That proposition rests on foundations too sound and too secure to require any support from authority. It is elementary in all systems of jurisprudence.

It is recognized in fact, if not in terms, by the defense, who proposes to account for it by the statement that the money was at once handed to Luminais, the minute clerk, since dead, with instructions to hand it to Henry Bier for investment in "baby bonds," in compliance with the original order of the court in the premises. What are the functions of the minute clerk of that court, and whence comes his legal mandate to receive, handle and dispose in any way, of the funds under the control of the court?

Under Article 138 of the Constitution he is appointed by the judge of the court, holds his office at the pleasure of the appointing power, and his duties are to be regulated by law.

Act No. 30 of 1880 defines his duties to be to " keep the minutes of

the court, issue all notices, copies of rules and orders entered on said minutes, which are required to be issued, and make due entries on the dockets of the causes and of the proceedings therein, and, shall perform such other duties as said judges may direct."

No intimation anywhere that he can be made the official custodian or depository of any money under the control of the court, and no suggestion that he is anything more than the ministerial officer of the court.

If the framers of the Constitution had had the remotest intention of entrusting the clerk of that court with the custody of funds of litigants or of successions pending in the court, they surely would not have adopted article 133, which reads: "The Civil District Court for the parish of Orleans shall select a solvent incorporated bank of the city of New Orleans as a judicial depository. Therein shall be deposited all moneys, notes, bond securities (except such notes or documents as 'may be filed with suits or in evidence, which shall be kept by the clerk of the court), so soon as the same shall come into the hands of any sheriff or clerk of court, such deposits shall be removable in whole or in part, only upon order of court."   *   *   *

Act No. 33 of 1880 inflicts a penalty of imprisonment of six months and a fine of $500 on any clerk, sheriff or officer for failing to make such a deposit, hence any construction of the provision which would leave the judge free to violate the same with impunity, must be repugnant to all sense of justice, as well as to common sense.

It is therefore impossible to deny the proposition that in handing this money to his minute clerk, the respondent did not discharge the responsibility which attached to him at the moment that he assumed and took upon himself the personal administration of that fund, and especially when he took manual possession of the same.

The selection of Luminais, the minute clerk, as the custodian of the fund, or as the messenger to transmit the same to Bier, could no more operate in favor of the judge as a legal discharge of his assumed responsibility than would have been done by selecting any other unauthorized person or private citizen.

It does not, therefore, lie in the mouth of the defense to advance the theory that Luminais, the trusted agent of the judge, embezzled and squandered the sum of $91.89, which was purloined by some one out of the original package, as a legal accounting on the part of the judge for the amount which he received from the judicial depository. That glaring illegality, and other reprehensible methods adopted in this case, all have their common source in the one great original mischief, which

consists in the judge's assuming the personal administration of that fund.

From the moment that such a responsibility was fastened upon him as a result of his violation of the law and of the rules of his court, that burden follows him like a phantom, not to be driven away by anything but uncontrovertible proof of a full accounting to the legal proprietor of the fund.

These considerations apply with equal force to his disposition of the bonds sent to him by Bier.

According to the testimony of Sel, which is not successfully contradicted, these bonds finally came to the hands of the judge some four or five days after the 7th of March, the day on which they were obtained from Bier, and it was therefore on the 11th or 12th that they were handed by the defendant to Luminais to be paraphed. Now, in his own testimony, the judge shows that on the 17th of the same month, Luminais was discharged by him from his office for habitual drunkenness and for consequent neglect of his duties—the minutes of the court having not been posted up for more than a week.

Can the Court now entertain such a transaction as a legal accounting of the bonds, even if they were thus delivered to a person held up as so eminently disqualified for the trust, *at most ten days* before his discharge as minute clerk for the causes stated by the defense? He must be met with the answer which would be given to any ordinary administrator or tutor under similar circumstances.

But there are many mysterious movements connected with all these transactions which the defense has not even attempted to explain.

An impartial but practical mind would naturally like to know, and no effort has been made to explain, why the judge who issued the order of March 3, 1882, for the avowed purpose of carrying out his agreement of that very morning with Bier, did not send the order directly to the latter who could as well as Mr. Sel have obtained the check from Onorato and the funds from the bank; or why Sel was not instructed to take the check or the money directly to Bier.

Conceding that the investment of that balance in bonds was the end in view, the defendant has not explained why he ordered the money to be brought to him at the court, or why he persisted in that design on Onorato's refusal, by interpolating additional words in the order, and to send for the money when he knew, as he states, that it could not be received before three o'clock p. m., after the broker's offices were closed.

No more has he undertaken to explain the legal reason or even the

propriety of removing those funds from the vaults of the judicial deposi-
tory, after three o'clock on the eve of a legal holiday, the 4th of March,
which itself was followed by a Sunday, and when he knew, as he ad-
mits, that the investment could not be made before Monday, the 6th.,
on which day the investment of a part of the fund was actually made.
He must have known that from Friday, "a few minutes after three p.
m.," (his own testimony) until Monday, the 6th, at 10 a. m., the fund
thus converted into currency was to remain in his possession or in that
of his clerk—certainly not as safe a custody as the vaults of the bank.

Why did he take that risk with money which was not his own, and
which, as he pretends, he did not even take the trouble to count, as a
check on the person to whom he was about to entrust it? No effort
has been made by the defense to lift that cloud so full of suggestive
darkness.

From that mode of dealing, from the omission to call his discharged
minute clerk, on the 17th of March, to an account for the bonds
which he had so recently intrusted to him, and from all the illegal acts
of the defendant disclosed by the record, and recounted in this opin-
ion, there flowed a result, the most natural to expect: a total loss of
the small pittance accruing to the minor, Arsene Quiazzaro, for whom
the respondent claims to have had the most paternal solicitude, and
for whose ostensible benefit so many bold measures had been inau-
gurated. What does this conduct amount to in law and under the
terms of the Constitution?

The answer is easily suggested. It clearly amounts to malfeasance
and gross misconduct.

But, in order to leave no doubt as to the correctness of that conclu-
sion, the record throws additional light on the conduct of this re-
spondent. In April, 1886, Arsene Quiazzaro, who had, in the mean-
time, been emancipated, employed counsel to look into the claim
which she had been informed she had once had to a certain fund in the
custody of B. Onorato. As the record of the Quiazzaro succession, to
which had been added the papers of the proceedings hereinbefore de-
tailed, could not be found, and as no satisfactory information could
be obtained of Onorato, a rule was instituted against the latter as
acting administrator, in defendant's court for an account of the minor's
homestead of $1000, or in default thereof, for an account of a similar
amount of baby bonds, in which the said fund had been invested
under orders of that court.

That rule was fixed for trial on the 7th of May, 1886, and continued
from that day, and from week to week, until the 11th of June follow-

ing, when the respondent judge entered an order continuing the rule indefinitely, over the urgent objections of counsel for Miss Quiazzaro. With the exception of two instances, these various continuances were ordered by the court on the ground urged by the defendant in rule, that he could not be forced to trial in the absence of the record, or in the absence of certified copies duly stamped (at a cost which Miss Quiazzaro was unable to meet), of all the minute entries of all the proceedings which were connected with the fund, which had been placed in the custody of Onorato.

These different rulings of the respondent are charged by relator to be glaringly erroneous and to amount to a denial of justice, and as intended to suppress knowledge of his connection with the fund.

As our jurisprudence has long since settled the doctrine that the minutes of a court are part of the record to which they may refer, and need not be offered in evidence (State vs. Fuller, 14 Ann. 726), it was a gross misconduct in the judge to refuse a hearing of the rule on the minute entries. If they were insufficient to make out a case, the judge could have so decided, and his judgment could have been reviewed on appeal. But it was manifestly not a ground for the refusal of a hearing.

From the record, it appears that on the 28th of May, the defendant, who claims to have forgotten all about the transactions of the year 1882, particularly of the 3d of March, was reminded of his connection with the fund, notwithstanding which information he persisted in his previous rulings both on the 4th and the 11th of June following.

And in November of the same year he entered an order of recusation in the matter, which is now pending before another division of the Civil District Court.

In the light of preceding events these acts speak for themselves, and confirm the conclusion of malfeasance and gross misconduct against the defendant.

In this connection it is due to the memory of Charles E. Sel to make the following statement:

On the 5th of May, 1886, while Onorato was trying to explain his defense to the rule to his attorney, in the same office in which Sel occupied a desk, the latter, overhearing their conversation and desiring to assist Onorato, volunteered the statement that he knew the history of the last check drawn by Onorato, and that it had been handed to, and collected by, him; and the proceeds delivered to the defendant judge, in obedience to his order of the 3d of March.

That circumstance is a complete refutation of the theory advanced by the defense to the effect that the missing sum of $91.89 had been

appropriated by Sel and Luminais, and had been by them both and together spent during the festivities of the 4th of March.

The charge is absolutely unfounded and is not supported by a single word of testimony in the record. There is no proof that either of them participated in those festivities, while on the other hand it is shown by the testimony of Theodore Marks, the principal witness for the defense, that the respondent was a marshall in the procession of that day.

If Sel had been guilty of the charge hurled at him on his dying bed, it would be passing strange that he was the first person to awaken the dormant memory of all other participants in incidents connected with his guilt.

In view of his statement in that connection, in which he is fully corroborated by Onorato, it is very unfortunate, and it is extraordinary that Onorato or his attorney did not at once confer on the subject with the judge whose order was his shield, and before whose court he was prosecuted for an account of that identical fund.

The law which governs the case is very plain and free of all ambiguity.

The Constitution provides that a district judge may be removed by this Court for " high crimes and misdemeanors, for non-feasance or malfeasance in office, for incompetency, for corruption, favoritism, extortion or oppression in office, or for gross misconduct or habitual drunkenness.

It is clear that the evidence implicating the judge on trial with guilt of any one of the causes therein detailed, is sufficient to require a decree of removal.

The contention of the defense that the malfeasance or non-feasance or gross misconduct charged must, as a condition precedent to removal, be proved to be criminal or corrupt is manifestly erroneous. It is absolutely untenable either in reason or on authority. It is answered by the mere fact that in the Constitution the contemplated causes of removal are disjunctively connected.

All the authorities which are to the effect that a criminal intent must underlie the commission of impeachable offenses are predicated on the provisions of Sec. 4, Art. 2 of the Constitution of the United States' which reads: " The President, Vice President, and all civil officers of the United States, shall be removed from office on impeachment for, and conviction of, treason, bribery or other high crimes and misdemeanors." That authorities which comment on that language have no bearing on the contention here is as clear as the difference between the two constitutions is palpable.

Now, malfeasance is defined to be "evil doing," "ill conduct," "the doing of what one ought not to do." (Worcester.)

Also "the unjust performance of some act which the party had no right, or which he had contracted not to do." (Bouvier.)

Or "the commission of some act which is positively unlawful." (Abbott.)

It was the undoubted intention of the framers of the Constitution, as of all other legislators, that the words which they used should be understood in their plain ordinary meaning.

Hence they left it to the sound and legal discretion of the Supreme Court to give in proper cases a more precise definition, if it became necessary, and to see to it that none but able, consciencious and irreproachable judges should by their decree be ever retained as magistrates in the State of Louisiana.

They acted on the idea contained in the paternal recommendation of the first, the great Chief Justice of Louisiana, Judge Martin, when he said: "All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. None should serve at its altar, whose conduct is at variance with his obligations."

The trust to enforce this lesson of wisdom has been confided to the Supreme Court, and although the task is unpleasant, it must be performed impartially and fearlessly.

Relator's petition contains several other specifications of a serious character against the respondent, but as the larger number of these charges involve rulings and other matters which have already, and in a different form, been submitted for judicial action before this court, and as the foregoing considerations so forcibly point to the irresistible conclusion of the removal of the defendant, it becomes unnecessary to discuss any of these additional charges. After the evidence had been taken, and ten days of the trial had been consumed in hearing it, the defendant filed a plea in bar, denying the authority of the court to entertain charges of acts alleged to have been committed by him prior to the month of August, 1884, at which time he had been reappointed judge by the executive of the State, on the ground that said alleged acts had been committed under a different and distinct term of office, and under a different and distinct commission. Considering the nature of the answer which the defendant had filed, and in which he had joined issue on the merits of all the charges brought against him, considering the stage of the trial at which that defense was invoked, and considering the tone of a letter, which he had

11

State ex rel. Attorney General vs. Lazarus.

written to the Attorney General, urging the latter to institute this proceeding, in which he manifested his intention to waive all matters of form, as well as his desire that that officer should assume that there was *prima facie* evidence of every charge that was made against him, it must be confessed that the resort to such a plea was a great surprise to all, that it came rather late, and that it was exceedingly ill-advised.

The entire absence of any argument in its support by the defense, either orally or in writing in the brief submitted by counsel, is a tacit acknowledgment of the innate weakness of the plea as a means of defense.

Leaving open the question as to its applicability to any of the charges which are not discussed in this opinion, it is quite plain that it cannot apply to the matters and things charged in connection with the fund accruing to the Quiazzaro minor, the only charge which has been herein discussed.

This charge is formulated on a continuity of acts not publicly known before July of the year 1886, and alleged to have been committed under both terms and both commissions of the respondent judge. Hence the plea falls under its own weight.

And the charge of malfeasance and gross misconduct having been fully made out by the evidence, the proper decree must be entered.

It is therefore ordered, adjudged and decreed that the respondent, Henry L. Lazarus, Judge of the Civil District Court for the parish of Orleans, Division E, be, and he is hereby removed from said office; that said office be and is hereby declared to be vacant, and that the said defendant be condemned to pay all the costs of these proceedings. And it is further ordered that a certified copy of this judgment be forwarded to his Excellency the Governor of the State of Louisiana.

---

CONCURRING OPINION.

BERMUDEZ, C. J.   In my judgment, the answer convicts the defendant of malfeasance and gross misconduct and incompetency.

The evidence conclusively establishes that he has of his own motion, without the slightest shadow of authority in law or jurisprudence, nay, in utter violation of both, and even of the rules governing his court, handled and disposed of a fund deposited in a bank selected as the judicial depository and under the control of his court, and that he has utterly failed to legally account for it.

It is no doubt the law, that the funds of a minor may be invested in State bonds; but it is not the law that the judge, though he be the tutor of tutors, shall attend to the investment *himself*.

State ex rel, Attorney General vs. Lazarus.

It is no defense to urge, in exoneration, that those to whom he entrusted it, for that purpose, have dissipated it some way or other.

The defendant is officially and personally, morally and legally, bound for the tortious acts of mandataries; selected by himself and not designated by law, as the proper persons to be entrusted with such investment.

The elaborate, lucid and unanswerable opinion just read, in which I concur, demonstrates beyond peradventure that the respondent is clearly guilty of flagrant malfeasance, gross misconduct, or is incompetent; and that, in either case, he must be removed.

A judge who uses, or misuses, the powers with which the law clothes him, and who, by unwarrantable acts, imperils and annihilates fortunes and rights which he ought sacredly to protect, cannot be permitted to continue on the Bench as the representative and dispenser of justice among his fellow beings.

The decree removing the defendant is fully justified, and I assent to its rendition and enforcement.

## CONCURRING OPINION.

FENNER, J. Article 196 of the Constitution of the State authorizes the impeachment of various public officers named therein for the following specified causes, viz: "For high crimes and misdemeanor, for nonfeasance or malfeasance in office, for incompetency, for corruption, favoritism, extortion or oppression in office, or for gross misconduct or habitual drunkenness."

Article 200 provides as follows: "For any of the causes specified in article 196, judges of the courts of appeal, of the district courts throughout the State, and of the city courts of New Orleans, may be removed from office by judgment of the Supreme Court of this State issued in a suit instituted by the Attorney General or a district attorney in the name of the State, on his relation. The Supreme Court is hereby vested with original jurisdiction to try such causes; and it is hereby made the duty of the Attorney General or of any district attorney to institute such suit, on the written request and information of fifty citizens and taxpayers residing within the territorial limits of the district or circuit over which the judge against whom the suit is brought exercises the functions of his office. Such suits shall be tried after citation and ten days' delay for answering, in preference to all other suits, and wherever the court may be sitting; but the pendency of such suit shall not operate a suspension from office. In all cases where the officer sued, as above directed, shall be acquitted, judgment

shall be rendered jointly and *in solido*, againstthe citizens signing the request, for all costs of suit."

This suit is brought against the defendant judge under the foregoing provisions, on the relation of the Attorney General, acting on a petition signed by eighty-eight citizens and taxpayers, including one judge of the same court of which defendant is a member, and thirty reputable members of the New Orleans bar.

The petition charges that the defendant "has been guilty of nonfeasance and of malfeasance in office, of favoritism and oppression in office, and gross misconduct, and that he is incompetent for the duties of his office and should be removed."

These charges are supported by eight distinct specifications.

The first specification, enlarged as it is by the elaborate answer of respondent and by the reception of evidence without objection, involves the judicial conduct of respondent in a certain cause pending in his court under the title of the succession of Nicholas Quiazzaro. The following is a history of the proceedings in the case:

Nicholas Quiazzaro died in September, 1868, leaving a considerable estate, a widow in community, two living minor children and another who was born after his death.

The succession was opened in the then Second District Court. The widow was appointed and qualified as tutrix of her minor children, and an under-tutor was appointed. The succession, however, was administered by an administrator, who was duly discharged in June, 1870, when he handed over to the tutrix the residue of the estate, consisting of $17,715.17 in cash, and about $6,000 in promissory notes.

Under the law of this State, the tutrix, as surviving widow in community, was the owner of one half the estate and the usufructuary of the remaining half belonging to her children And in so far as the estate consisted of money, her usufruct made her the owner of the whole, subject to the duty of accounting to her children at the termination of the usufruct. The minor's rights were also secured by a general mortgage on all the immovable property of the tutrix.

We have no further concern with the case until December 28, 1880, when the cause had passed into the division of the Civil District Court, presided over by respondent, and when two of the heirs had reached the age of majority and only one remained a minor, to wit: Arsene A. Quiazzaro. We extract from defendant's answer his account of the proceedings then had:

"On December 28, 1880, the tutrix presented another petition, averring her ownership of the two lots of ground in this city, which

had been bought since her appointment as tutrix, her indebtedness to her children, the large tax encumbrance on these properties, their unprofitableness as a source of revenue, the advisability of selling the same, and asking for the appointment of experts to appraise the property, and for the convocation of a family meeting to advise about the rights of the minor. On December 29th, respondent entered the proper order on this petition, appointing experts and convoking the family meeting. On December 30, 1880, the deliberations of the family meeting held that day, approved by the undertutor, appraising the property at $3000, and advising the sale at public auction for one-half (½) cash, and the other half at one year's credit, were presented to respondent, and by him homologated. No adjudication having been made under this order, the tutrix, on February 8, 1881, filed her petition stating her indebtedness to her children, and her desire to settle with them; that she was utterly destitute of means, except the two properties above mentioned, which were a burden rather than a source of revenue, they being out of repair, and seldom rented on that account, and encumbered with taxes to such an extent that they were about to be sacrificed at sheriff's sale; that she had caused them to be offered at public sale, but that she could not sell them unless authorized to sell them free of the minor's mortgage. She prayed for convocation of family meeting to authorize erasure of minor's mortgage in case of sale, and to receive funds of minor realized from sale, to be reinvested by her. On February 12, 1881, respondent endorsed on said petition an order convoking a family meeting. The family meeting was held the same day. Two days afterwards, on February 14th, the tutrix filed the *proces verbal* of this family meeting, recommending the erasure of said minor's mortgage in case of sale, accompanied by a petition asking the homologation of the same, and for authority to erase the minor's mortgage."

Before acting on this petition the judge very properly considered that it was his duty to examine into matters in order to determine whether the reception and investment of any funds resulting to the minor could be safely trusted to the tutrix, whose usufruct had been terminated by a second marriage, or whether he should himself supervise their control and investment. To that end, he says:

" That respondent accordingly, thereupon, on the 23d day of February, 1881, appointed Joseph Garidel, Esq., one of the experienced deputy clerks of the court, as expert, to inquire and report to the court the amount of taxes and charges due on the properties aforesaid. He also instructed said Garidel to examine and report upon the manage-

ment of the estate, *and to whom the net proceeds of the property should go—to the major heirs or to the minors.* Respondent also had the testimony of Garidel, and of Ben Onorato, auctioneer, taken as to the value of the property and as to whether the taxes and penalties could be paid at a discount.

" On April 5th, 1881, Garidel presented his report, showing privileged taxes and charges against the estate amounting to $2,317.65, setting forth the mismanagement of the estate, *and reporting against the claims of the majors to participate in the net proceeds, if any, of the sale of the property.*

" Thereupon, respondent entered the following order upon the above mentioned petition of February 1st, 1881:

"It is ordered, adjudged and decreed that the *proces verbal* of the 12th of February, 1881, be homologated and approved, and the recorder of mortgages directed to erase and cancel the general mortgage in favor of Arsene Adelaide Quiazzaro, in so far as the same affects or operates upon the property described in the petition and *proces verbal* of the date aforesaid.

"It is further ordered, adjudged and decreed that the property described as aforesaid be sold for cash, by Ben Onorato, auctioneer, to the highest bidder, after usual advertisements prescribed by law.

"It is further adjudged and decreed that a *proces verbal* of the sale be filed in court, and the price realized from said sale be deposited in the judicial depository, there to await the order of the court for the payment of taxes and charges, upon the court's approval.

"It is further ordered, adjudged and decreed that Henry Bier be authorized to settle the taxes due on said property; first filing a statement at what rates said taxes can be settled, and subject to the court's approval.

"It is further ordered, adjudged and decreed that any surplus remaining from the amount realized from said sale, after payment of the taxes, charges and costs due by said property, *up to the amount of the general mortgage, in favor of Arsene A. Quizzaro,* be invested in State registered bonds, under Act of 1857 and Article 348 of the Civil Code.

"And it is further ordered that a fee of fifty dollars be taxed in favor of Jos. Garidel, as costs."

We are compelled to say that, in referring to an expert the question " to whom the net proceeds of the property should go, to the major heirs or to the minor;" in accepting and acting upon his report " against the claims of the major heirs to participate in the net proceeds, if any, of the sale of the property ; " and in entering, in effect,

a judgment divesting the major heirs of their interest and appropriating the whole to the minor, without any notice to, or hearing of, said majors, the judge exercised powers utterly foreign to the judicial office as constituted under the laws of Louisiana. The powers confided to masters in chancery and judicial referees under the systems prevailing in some other States do not exist, to the same extent, in Louisiana. Except in the case of arbitrators, who can only be appointed by consent of all parties, experts are appointed only for the purpose of stating intricate accounts, or furnishing the judge with information as to facts, never to ascertain or report legal conclusions from such facts. C. P. Arts. 441 to 462.

We must say, however, that we find, neither in the order of the court nor in the report of the expert, any reference of such question to the expert or report thereon by him ; and if such reference and report were made, as stated by respondent, they must have been in oral form.

It is very certain that the judgment of the court directing the entire residue of the proceeds of the sale to be devoted to the satisfaction of the minor's mortgage, to the exclusion of the major heirs, was *ex parte* null and void, and rendered without any authority of law, and that it is supported by no fact or reason apparent on the record. This act had an important sequence, which will be hereafter alluded to.

The judge proceeds in his answer as follows :

" Under this decree the property was sold, realizing the sum of $2025 ; the money was deposited by the auctioneer to his credit in the Branch Depository of the State National Bank, the authorized depository of the Court; the widow, on her petition, was authorized to sign deeds of sale ; the tax liens were, on her petition, transferred to the fund in Court; the State tax collector was ordered to strike off the illegal penalties and interest ; and orders were from time to time entered, directing the payment of taxes, costs, fees and charges."

The funds having thus reached the judicial depository, it is important to examine the provision of the law and of the rules of the Civil District Court, with reference to the handling of such funds.

Art. 133 of the Constitution declares : " The Civil District Court for the parish of Orleans shall select a solvent incorporated bank of the city of New Orleans as a judicial depository. Therein, shall be deposited all moneys, notes, bonds and securities (except such notes or documents as may be filed with suits, or in evidence, which shall be kept by the clerk of court) so soon as the same shall come into the hands of any sheriff or clerk of court; such deposits shall be re-

movable, in whole or in part, only upon order of Court. The officer making such deposits shall make immediate and written return to the court of the date and particulars thereof, to be filed in the cause in which the matter is pending, under penalties to be prescribed by law."

The rules of the Civil District Court (rule 24), contain the following provision:

" The —————— Bank of the city of New Orleans is selected as the judicial depository, under Article 133 of the Constitution, and Act No. 33 of 1880.

2. All moneys, bonds, notes, etc., coming into the hands of any clerk, sheriff, liquidator, receiver, syndic, commissioner, administrator, curator, executor, tutor, *auctioneer*, notary or other officer of court, under any order or process of court, or arising from the sale or administration of any property under control of court, or from any party to a suit, unless the order or judgment of court under which the same is realized direct the same to be otherwise deposited or disposed of, shall be deposited in said judicial depository, in the name and to the credit of the court and such officer, and due and immediate return thereof shall be made to the court and filed in the cause.

3. Drafts or orders on the bank for the payment of money or delivery of property, shall be made *to the order of the person entitled thereto, or his attorney duly authorized,* and. shall specify in what particular suit, or on what account the money or property is to be paid out or delivered.

4. Such orders or drafts shall be drawn by the officer, pursuant to an order of the judge of the division having control of the cause, wherein the property or money has been received.

5. *No order, unless by consent, shall be granted, except on regular notice or order to show cause duly served on the attorneys of all parties who have appeared therein.*

6. No order shall be granted, based upon consent, unless such consent be reduced to writing, signed by all parties and filed in the cause.

These rules of the Civil District Court were adopted by all the five judges thereof acting as one body, and rule 29 provided : " The rules shall not be altered or amended except by the vote of a majority of the judges." It is not claimed that rule 24 had ever been changed. It was, therefore, of binding force and effect upon the judge, and having been a participant in its confection and adoption, he could not plead ignorance thereof.

The important and salutary objects of the Constitutional provision and of the rule are evidently to destroy the possibility of the diver-

sion or miscarriage of any funds subject to judicial control by the following provisions:

1st. All such funds, of whatever character, are required to be deposited, as soon as realized, in the judicial depository and the performance of this duty is secured by requiring an immediate return of such deposit to the court, failure to make which is, by Act 33 of 1880, made a criminal misdemeanor, punishable by fine and imprisonment.

2d. Once in the judicial depository, such funds cannot be withdrawn, except upon an order or draft made payable directly to the order of the person entitled to receive it, and specifying on what account the payment is made, pursuant to an order of the court which, necessarily, in order to enable the officer to comply with the rule, should specify the person and the account.

3d. In order to protect parties interested and the court itself from improvident orders granted on *ex parte* representations, the rule forbids the granting of such orders, unless by consent, without regular notice or order to show cause, served on the attorneys of all parties.

4th. Even consent orders are forbidden unless. the consent be in writing, duly signed, and filed in the cause.

From the moment that these funds reached the judicial depository, the course of the judge is marked by a conspicuous disregard of every provision of the foregoing rule, as well as of all sound principles of judicial conduct.

He has utterly ignored the existence of the tutrix, the under-tutor, the major heirs and the attorney of the tutrix, and has acted precisely as if the law constituted him personally the sole administrator of the minor's estate, without responsibility to anybody but himself.

He appoints various experts, fixes their fees and orders their payment, to an aggregate amount of one hundred and fifty dollars, without application by, or notice to, anybody.

He settles the fees and expenses allowed to the attorney of the tutrix to the amount of $181.80, and directs their payment by *ex parte* orders without any application therefor on the part of the tutrix, so far as the record shows, and without notice.

In like manner, various other costs, charges and expenses, besides taxes, are allowed and paid.

All formalities of contradictory proceeding, of filing account, of giving notice thereof by publication and otherwise, of legal delays for opposition thereto and for final judgments of homologation, are entirely dispensed with.

Where is the legal authority for such proceedings? None is referred

to and none exists. No precedent is produced; and, although the judge declares that he has pursued a like "course in other cases with beneficial results," not even a precedent of his own court is referred to; and the allegation, if true, would certainly not support or mitigate the illegality of the proceedings.

In the disbursement of these funds, he has violated the rules of the court by granting orders without written consent, and without notice or order to show cause.

He has further paralyzed the protective operation of the rules by interposing between the person entitled to receive the money and to whose order alone the checks should be payable, irresponsible agents of his own selection, who draw the money and are intrusted with the duty of conveying it to the party entitled. Thus the very danger which the rule was intended to avert is incurred and aggravated; and funds, which even bonded public officers are not trusted to take or hold in their possession, are passed into the possession of individuals having no title to them and furnishing no security for their faithful custody and appropriation.

If the funds of this estate have been misappropriated and lost under such proceedings, whose fault is it?

Let us now examine a few of the most important of these orders, to exhibit more clearly the manner in which this business was transacted.

On September 16th, 1881, the following order is entered on the minutes:

"Let the Judicial Depository be and it is hereby ordered to pay out of the funds of this estate the sum of $396.85, the same to be applied to the payment of State taxes and of F. A. Luminais for services rendered herein under the appointment of the court, viz:

To State taxes ........................................... $386 35
To F. A. Luminais ....................................... 10 00

                                                          _____
                                                          $396 35"

It is obvious that the only person entitled to receive payment of the State taxes was the State tax collector, and the order should have directed the payment to be made on check to his order. If this had been done, there could have been no risk of loss. But it is admitted that the judge entrusted to his minute clerk the direct collection of the money paid under this order, and the duty of paying therewith the State taxes. What was the result? Although the clerk collected the money on September 16, 1881, it is shown that the taxes were not paid until November 3 following. No care was taken by the judge to see

to the performance of the duty confided by him to his agent, by requiring the return or exhibition of the tax receipts.    And, in fact, the entire sum narrowly escaped loss ; for it appears that the clerk, after getting the money, went on a spree and lost or gambled it away, and was only able to replace it later through the kind offices of a friend, who, after full confession of his fault, lent him the sum on pledge of his future salary, from which source, be it said, the loan was duly repaid.

On February 10, 1882, the following order appears duly entered on the minutes of the court.

" On account presented for taxes due on the property sold in the succession of Nicholas Quiazzaro and still unpaid, it is ordered that the same, amounting to $147 26 be paid by B. Onorato, administrator, and charged to the succession."

Onorato paid this money, to whom is not apparent.

Although the conduct of the judge in this succession had been the subject of investigation by two grand juries, and although the entries upon the minutes had been all the time open to scrutiny, the genuineness of this order was never disputed by the judge, and even in his answer in this cause no such dispute is presented, but, on the contrary, the orders generally are referred to and admitted.  But, after the cause was at issue, investigation disclosed the fact that no such taxes were due or had ever been paid.    And, thereupon, the defendant is driven to the necessity of disputing the correctness of the minutes of his own court, of denying that he ever issued such an order, and of charging that it was forged and fraudulently entered upon the minutes of the court by his then minute clerk, who is now dead.   This may be true.   I will not say even that I believe it to be untrue.   But, surely, under the most charitable construction, it is a desperate predicament for a judge to be placed in, when, in defense of his own character, it is necessary for him to falsify the minutes of his own court, and to fasten upon a dead man the guilt of such a crime, with no evidence to support the charge except his own, which cannot be contradicted.

Charity for the living and for the dead closes my mouth against the expression of an opinion on this subject, when it is not, in my judgment, necessary to the decision of this case.

One thing is certain: the money was paid on the order; the money has been made away with, and is lost to the estate.   Whose ever the crime, the possibility of its commission and the consequent loss, are directly attributable to the fault of defendant.

But for his habit of granting orders in this illegal form and of delegating to his subordinates the duty of collecting them, the thought of attempting such a fraud would never have suggested itself to any one.

We come now to the winding up of this extraordinary administration.

On February 10th, 1882, an order was entered on the minutes, " that B. Onorato, *administrator*, do render an account of the balance of funds in his hands belonging to the succession of Nicholas Quiazzaro." The genuineness of this order is expressly admitted in defendant's answer herein, with this statement, that " this order was not complied with, possibly because it does not seem to have been served on him."

The peculiarity of this order and the foregoing one, in styling Onorato (who received and disbursed these funds simply in the capacity of auctioneer who sold the property) *administrator*, does not appear to have struck the mind of the defendant until the necessity arose, as above indicated, of destroying the genuineness of the first order, when this feature is seized upon as a reason why respondent could not have framed either of said orders, because he could never have styled Onorato administrator, although in one former order drawn, however, by an attorney, the same style was used, and although the books of the judicial depository show that the account stood in the name of " B. Onorato, administrator," and although the only extant check of Onorato is signed " B. Onorato, administrator."

On March 3, 1882, the following order was entered on the minutes:

" More than six months having elapsed since the sale of the property in the above succession, and *no opposition to the distribution of the same having been made, and no one claiming any interest in the proceeds of said property* other than the minor Quiazzaro, it is ordered that the proceeds of said property belonging to the succession of Quiazzaro, be invested in State consols, or bonds, of the State, known as ' Baby bonds,' and that said bonds be registered by the Auditor of the State under Art. 348 of the Civil Code."

The recitals of absence of opposition to the distribution and of no one's claiming an interest in the proceeds, afford a sufficiently slender support for this final order, when it is considered that the whole proceedings of distributions had been, not *ex parte* (for that suggests at least *one* party), but without any party at all, and with no pretence of notice in any form.

However, the order was made, and a certified copy of it having been supplied, the judge sent for one Charles E. Sel, a subordinate deputy in the record department of the Civil District Court, handed him said

copy, and directed him to go to Mr. Onorato, get an order for the money, collect it and bring it to him.

It indicates the utter carelessness of the judge in such important matters that he should have supposed that Onorato would have paid out money on an order framed as this one, not even directing any such payment to be made either by him or by the judicial depository. Of course Onorato refused to pay, and Sel returned to the judge and reported the refusal with the reason given that the order did not specify any person whom he was to pay. Thereupon the judge interpolated in the certified copy, with his own hand, the words "and that said B. Onorato be ordered to pay the same over, to make said investment."

This addition was never entered on the minutes, and the certificate under the seal of the court that it was a true copy from the minutes was thus converted into a falsehood.

With the order thus amended, Sel returned to Onorato, received from him a check payable to bearer, with the order of court attached, for the sum of $291.54, collected the money, returned and handed the money to the judge, who received it into his own hands. Although he had not advised himself of the state of Onorato's account, and although his order did not specify the balance due, he did not count the money, but, as he states and as stated by Marks, another witness, he sent for his minute clerk, handed him the money, with instructions to go to Henry Bier, a broker of this city with whom defendant had already arranged to buy the bonds without commission, and invest in "Baby Bonds."

This was on Friday, March 3d, after business hours; the next day was Saturday, March 4th, a legal holiday; the next was Sunday; and so Bier was not seen until Monday, March 6th, when it appears that an investment was made in "Baby Bonds," but only of the sum of $199.65, and the difference of $91.89 had disappeared and has never been traced.

Let any one read the article of the Constitution and the fourteenth rule of the Civil District Court, and imagine any contingency in which this money could, during this period, have been lawfully out of the judicial depository, and first, in the hands of Sel, then in the hands of the judge, then in the hands of a minute clerk. What necessity was there for such proceedings? How easy and natural it would have been to have complied with the law by ordering the payment to be made in a check to the order of Bier, on delivery of the bonds?

Hence, if loss occurred, whose was the fault?

The defendant, in his answer, says:

"At the next session of the court on Monday, March 6, 1882, re-

spondent asked Luminais about the bonds aforesaid, and was informed that Bier still had them, and that he was too busy to go up that day and get them.

"On the following day he made the same inquiry, and received substantially the same response; and thereupon, respondent again sent for the said Charles E. Sel and directed him to go up to the office of said Bier and get the said bonds. That said Sel went to the office of Henry Bier, received from him a package of "baby bonds," and delivered them to respondent."

I will not enter into the painful conflict of testimony which here ensues between the testimony of Sel and that of the judge, because, in my view of the case, it is not essential to the decision of the cause.

Sel brought the bonds in a package, with a memorandum attached showing the number of the bonds and the amount invested, viz: $199.65, which he says he read and observed the difference between the amount and the sum he had collected on the order. But this difference did not attract the attention of the judge, who, as he states, did not know the amount of the money which had been collected and handed to him. He states that he handed the bonds to the minute clerk with instructions to paraph them with an endorsement to this effect:

"SUCCESSION OF N. QUIAZZARO. { No. 842, Civil District Court, Parish of Orleans.

"This bond is the property of the minor, Arsene Adelaide Quiazzaro, purchased by virtue of a decree rendered in this succession, and is not transferable, unless by virtue of a decree authorizing the same;" and then "to sign and seal the same with the seal of the court, and when so written upon, signed and sealed, to deliver the same to the counsel for the tutrix, who, from the time of the sale of the property in June, 1881, had besieged respondent with requests to direct the payment of the fund in court to the tutrix."

This direction is in conflict with the plain requirements of Art. 348 of the Civil Code, which requires that, in case of such investments of minors' funds, the bonds shall be registered in the office of the Auditor of the State in the manner specifically directed.

The excuse given for this departure from the law, is the impression of the judge that the Auditor would charge $3 for the registry of each bond, and that, the bonds being only for $5 each, this would consume their value; but it is clear under the law that the Auditor has no right to charge for such registry, and it does not appear that it is the practice to do so.

This is the last that has ever been heard of these bonds; and although only ten days afterward, the judge discharged his minute clerk for intemperance and neglect of duty, it does not appear that he ever concerned himself about the question whether his directions had been complied with.

The minutes and the record of the case contain no trace of any of these proceedings touching the money and the bonds after the order of March 3, 1882.

The minute clerk is dead; Lemonnier, the counsel of the tutrix, is dead; the records of the court are silent; and the defendant's account of his conduct in reference to the money and the bonds admitted to have passed into his manual possession, is established only by oral testimony of himself, corroborated in some points by Marks and Doran, but contradicted, in very important particulars, by Sel.

I do not deem it necessary to dwell upon this conflict of evidence, or to draw inferences which must be unfavorable to the veracity either of defendant or of Sel, who testified in his death-chamber, and who, since the trial of this case, has gone to give his account before a Tribunal infinitely higher than any earthly one.

No further proceedings were had in the cause until April, 1886, after the lapse of four years.

It appears, however, that, in the meantime, Mr. Soubit, the husband of one of the major heirs of Quiazzaro, had made some inquiries into the matter and had called on the judge in person to inquire what had become of the money of the estate; but the judge dismissed him with the statement that the major heirs had no concern in the matter, or words to that effect; thus carrying out his *ex parte* decree of April 5th, 1881, already commented on.

Soubit employed a lawyer, who, after examining the record and ascertaining the position of affairs, advised him that the assertion of the rights of the major heirs would be troublesome and expensive, and that the amount involved did not justify his undertaking the case. Soubit also consulted other attorneys, who did nothing.

And so matters rested until April, 1886, when the minor, Arsene A. Quiazzaro, having been fully emancipated, employed counsel to look after her rights.

The record of the Quiazzaro case was now lost and, after the most diligent search, could not be found. Counsel could get no information except what was contained in the minutes of the court.

On April 29th, 1886, the following rule to show cause was filed and made returnable Friday, May 7, 1886:

176 SUPREME COURT OF LOUISIANA.

No. 824.

" SUCCESSION OF N. QUIAZZARO. } Civil District Court for Parish. of Orleans, Division " E."

" Rule on administrator filed April 29, 1886.

" On motion of A. Brieugne and Sambola & Ducros, of counsel for Miss Arsene Adelaide Quiazzaro, now duly dispensed from the legal age of majority.

" It is ordered by the Court, that Ben Onorato, acting administrator of the aforesaid succession and depository of its funds, do show cause on Friday, the 7th of May, 1886, at 11 o'clock a. m., why he should not pay her in cash, her orphan's homestead of one thousand dollars, or else deliver or cause to be delivered to her, in lieu of the cash, State bonds, known as Baby bonds, for the like total amount, duly registered and made non-negotiable according to law, into which said homestead was to be invested, in pursuance of an order of his honorable court by the said B. Onorato, from whom mover has never been able to have a satisfactory account of his acts and doings in the premises, and who was in law and in duty bound to cause said investment to be made."

The extraordinary character of this rule is freely commented on by counsel, but we think it is easily accounted for. Why should the minor's counsel not have supposed that Onorato was administrator when they found him so characterized in three orders on the minutes? And, since the minutes furnished no suggestion of any other reason why the judge should have allotted the whole residue of the estate to the minor to the exclusion of the major heirs, the error of assuming that it must have been, in some way, a recognition of the homestead right, was not inexcusable. And, inasmuch as the minutes do not show the amount ordered invested in " Baby bonds," the claim of $1000 was not unreasonable.

The judge says that all memory of the transactions had passed entirely from his memory. Onorato was equally oblivious, and could find none of the orders or checks on which he had disbursed the money, except the last check for $291 54, and that was payable to bearer, and he had no recollection to whom it had been delivered.

Onorato carried the rule to his counsel and was explaining his situation, when Charles E. Sel, who at that time occupied a desk as a notary in the counsel's office, overhearing the conversation, interrupted it and informed them that he was the person who got that check, and then told all about the transaction.

It does not appear, however, that Onorato communicated these facts either to the counsel of the minor or to the judge, until May 28th. The

rule, in the meantime, had been thrice continued for various reasons, when, on May 28th, it was fixed and continued for the fourth time to the 4th of June, upon the objection of Onorato's counsel to go to trial without the record. As the minor's counsel was leaving the court he met Onorato, who then conveyed to him the information received from Sel, to the effect that he had collected the money and received the bonds and handed both to the judge in person. Thereupon the counsel returned into court and informed the judge of what Onorato had said.

This, for the first time, seems to have occasioned a flash of recollection in the mind of the judge. He then sent for Sel and possessed himself of the facts, as he has detailed them in his answer.

He thus became aware that his administration had resulted in the loss of the last remnant of the minor's estate, and that Onorato, who had acted in strict obedience to his orders, was now being prosecuted, *before him*, to make good this loss.

That he should ever have sat again in the cause, for any purpose, I must pronounce utterly improper and unjustifiable. Whatever may have been his confidence in the correctness of his own conduct, and whatever his opinion on the question of his own legal or moral responsibility *to the minor*, the question raised by the rule was as to Onorato's legal responsibility; and it is clear, beyond dispute, that if Onorato was legally responsible to make good this loss, the judge was morally, if not legally, bound to hold Onorato harmless.

On the 4th of June, before the rule was called for trial, he called the counsel for the minor into his private office, and there held a long interview with them in which he narrated and justified his conduct in the premises, invited their opinion as to whether he was morally or legally responsible for the loss, and received from them the plainest intimation that they so considered him. Nevertheless, he acted in the case by continuing the rule until June 11, when he stated that Mr. Bier would be in court.

The 11th of June came, but Mr. Bier was not there. The judge called the rule, and on objections, the nature and validity of which are, in my view, immaterial, against the strenuous protest of the minor's counsel, he ordered the rule *continued indefinitely*. And so matters stood until the adjournment of the then session of the court. The conduct of the judge now became the subject of public gossip and scandal.

The matter was under investigation of two grand juries of the parish and, though no indictment was found, the second grand jury, in its published report, censured the official conduct of the judge.

Matters finally culminated in the bringing of this suit.

The trial was remarkable for the length of time consumed, for the large amount of evidence taken, for the contradictions in the testimony, for the variety and number of circumstances which favored different theories of the facts, for the array of distinguished counsel appearing on either side and for the eloquence and ingenuity of the arguments. One listening to these arguments, so far as the Quiazzaro case is concerned, would have supposed that the main, if not the only, issue was the guilt or innocence of the defendant of the crime of embezzling and converting to his own use the funds and property of the estate. The most ingenious and plausible theories of the facts and circumstances of the case were presented by opposing counsel on the one side inconsistent with his innocence, on the other precluding the possibility of his guilt. His enemies will readily accept the first; his friends, the last; the indifferent will be divided.

I do not find it necessary to decide that question, but I give the defendant the benefit of the statement, that if the success of the State's case depended on proof of embezzlement by the judge, I should vote for his acquittal. If the Constitution had meant that judges were removable only for " crimes and misdemeanors," Art. 196 of the Constitution would have stopped with those words, and would not have enumerated the other nine distinct causes of removal, including "malfeasance in office " and " gross misconduct." In the use of these terms it obviously referred to acts which were not " crimes or misdemeanors." It does not declare that any judge who shall be convicted of " malfeasance in office " or " gross misconduct " *shall* be removed; but it clearly means that such offenses may be proper causes for removal, and it throws upon this court the grave responsibility of determining what kinds and degrees of malfeasance or misconduct should incur the penalty.

In discharging this duty, we must pay due regard to the nature of judicial duties, and to the broad shield of protection which is extended over the errors of judges in the exercise of their jurisdiction ; but we must, at the same time, be mindful of the dignity of the office and of the deep interest which the public has in the proper administration of justice, and in having judges whose conduct occasions no just cause for reproach or for loss of confidence in their integrity and reasonable discretion.

By " malfeasance," under all definitions, is meant the doing of things which one ought not to do, or the doing of illegal acts.

See Webster, Worcester, Abbott, Bouvier. The recital we have

given of the proceedings in the Quiazzaro case exhibits a long trail of illegal acts, in clear violation of law and of the rules of his own court, and in excess of any jurisdiction conferred by law on any court in this State.    Jurisdiction is defined to be the function of judging causes wherein rights are disputed; the power of hearing and determining a cause.   Wells on Jurisdiction of Courts, p. 1 ; U. S. vs. Arredondo, 6 Peters, 709.

The jurisdiction which the judge had over the matters involved in the case entitled the succession of Quiazzaro, gave him authority to determine all questions which might be presented to him for decision by the parties thereto ; but it gave him no authority to assume the personal administration of the estate, to enter judgments and grant orders without notice and of his own motion, to expend moneys, to handle funds and to commit them, for any purpose, into the hands of mere ministerial officers of his court.

If the law had committed to him such functions they would have been ministerial, and not properly judicial functions.

The case is made worse by the reckless carelessness with which the functions were discharged and by his disregard of the rules of his own court in the methods adopted.

The result of this malfeasance has been the entire loss of the estate, of the administration of which he thus took charge.   The auctioneer, who acted strictly under his orders in disbursing the proceeds of the property sold, is sued to make good the loss.

The circumstances surrounding the loss of the funds have been of a character to subject the judge to grave suspicions of his integrity, and have led to investigation by grand juries.   The scandal has been such that one of his fellow-judges, and thirty reputable members of the bar, who practice before his court, have felt justified in joining in the petition for his removal.   The Attorney General of the State, who is an involuntary actor in the proceeding, after hearing all the evidence in the case, has felt authorized to address the court and argue in favor of his removal.

If malfeasance of this kind, attended with such results, does not support the action for removal of the judge, what malfeasance, short of proven crime, would support it ?   Would any citizens hereafter feel justified in initiating an action for removal of a judge for any malfeasance not criminal, if the present demand were rejected ?   Would any court of impeachment, who respected the opinions of this tribunal, feel authorized to convict any judge or other officer for any malfeasance in office ?

Would we not, in effect, be obliterating from the Constitution the offense of malfeasance in office as a ground for either impeachment or removal by this Court?

To anyone who will calmly reflect upon the facts of this case, it must plainly appear that the only doubt as to its proper disposition arises from the simple fact that the officer involved is a judge.

If any other officer in the State were subject to removal by judicial process for malfeasance in office and gross misconduct, and were proven guilty of such clear violations of law and of the rules of his own office adopted by himself, resulting in such injury to others and in such imputations upon his official integrity, few would doubt the judgment of the court. So any administrator, executor, syndic or other judicial officer, charged with functions similar to those assumed by this defendant, who had been convicted of like offenses would, unhesitatingly, be removed.

But the law, in the exercise of a wise policy, has hedged around judges of courts with peculiar immunities.

The Supreme Court of the United States holds this language in regard to the subject of judicial liability:

"It is a general principle, of the highest importance to the proper administration of justice, that a judicial officer in exercising the authority vested in him shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge would be inconsistent with the exercise of this freedom and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility. The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries. Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry.  *   *   *   Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feeling, are being constantly determined in the courts. When the controversy involves questions affecting large amounts of property, or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision often finds vent in impu-

State ex rel. Attorney General vs. Lazarus.

tations of this character; and, from the imperfections of human nature, this is hardly a subject of wonder. If civil actions could be maintained in such cases against the judge because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality or maliciously or corruptly, the protection essential to independence would be entirely swept away. Few persons sufficiently irritated to institute an action against a judge for his judicial acts would hesitate to ascribe any character to the acts which would be essential to the maintenance of the action." Bradley vs. Fisher, 13 Wall. 347.

Judge Cooley after elaborating, with his usual perspicacity, the reasons underlying this doctrine, and after showing that the only authority to whom the judge owes an account of his conduct is the State, concludes as follows:

"Whenever, therefore, the State confers judicial powers upon an individual, it confers them with full immunity from private suits. In effect, the State says to the officer that these duties are confided to his judgment; that he is to exercise his judgment fully, freely and without favor, and he may exercise it without fear; that the duties concern individuals, but they concern more especially the welfare of the State and the peace and happiness. of society; that, if he fail in a faithful discharge of them, he shall be called to account as a criminal; but that in order that he may not be annoyed, disturbed and impeded in the performance of these high functions, a dissatisfied individual shall not be suffered to call in question his official action in a suit for damages. This is what the State, speaking by the mouth of the common law, says to the judicial officer." Cooley on Torts, p. 408.

Such is the law of this State, as of all other well-ordered countries.

Prior to the adoption of the present Constitution, with the exception of liability to removal by an address of two-thirds of all the members of both houses of the General Assembly, judges could be impeached only for " crimes and misdemeanors." Constitution 1868, Art. 81.

Thus, except for "crimes and misdemeanors," judges, in the exercise of their official functions within their jurisdiction, were responsible to no earthly tribunal. Hence, no doubt, arise the theory and assumption upon which this case has been mainly defended, and the impression shared, perhaps, by the public, that the State, in order to maintain the demand for the removal of the judge, must establish, beyond a reasonable doubt, his guilt of a crime or misdemeanor.

Such theories and impressions have no foundation under the provisions of the present Constitution, on which this suit is based.

The framers of that instrument, prompted, no doubt, by then re-

cent experience, determined that the responsibility of judges could not be safely left confined within such narrow limits. They, therefore, to "crimes and misdemeanors," added various other causes for removal, including malfeasance, non-feasance and gross misconduct; and they confided to this tribunal the discretion of determining what acts of that character would support a judgment of removal. In so doing, they doubtless supposed that, as judges ourselves, we would extend due protection to the rights, privileges and immunities of other judges; that we would jealously guard them against the malice of disappointed litigants, and the base suspicions of censorious scandalmongers, who, out of the corruption of their own natures, are prone to soil the purity of the most blameless with the slime of their foul imputations; and that we would cover their errors with that mantle of charity of which we ourselves deeply feel the need.

But, at the same time, it was certainly and confidently expected that we should carry, "full high advanced," the standard of judicial dignity, honor and propriety; that we should exact of judges, in the control and disposition of funds confided to their judicial superintendence, a reasonable compliance with those rules of law and of their own courts which are provided to protect the interests of all parties concerned against improvident dispositions and to secure the funds themselves from embezzlement and loss; and that, in such matters, as in all others, they should pursue a line of conduct so clearly void of offense and so distinctly stamped upon the record, that their dealings with such funds, in case of loss, should not expose their integrity to suspicion, and be remitted for their vindication to conjectural inferences from contradictory testimony and to theories based on circumstantial evidence which support the innocence of the judge only by assaulting the integrity of his agent, who is dead, to whom he entrusted these funds without the slightest authority of law and who, if guilty, could only have accomplished the crime through the grossest carelessness of defendant.

If defendant be civilly responsible to make good the loss occasioned to the minor, it could only be by reason of his having acted in such entire absence of jurisdiction as would emphasize the malfeasance and misconduct.

If he be not responsible, then so much greater is the necessity for enforcing against such malfeasance the only penalty provided by law.

Under a profound sense of my duty, under the Constitution, to the petitioners, to the State, to the people, and to the judiciary, I am compelled to write what are to me "a few of the unpleasant'st words that ever blotted paper," when I announce that I concur in the decree of the court.

## DISSENTING OPINION.

WATKINS, J.   At the request, and upon the information of fifty citizens and taxpayers, this suit was brought against respondent, for his amotion, and removal from office, in pursuance of the provisions of Articles 196 and 200 of the Constitution, on the grounds that he "has been guilty of nonfeasance and of malfeasance in office, favoritsm and oppression in office, and *gross* misconduct, and that he is incompetent for the duties of his office, and should be removed from office," etc.

I.

The question presented at the threshold of the controversy is:

What is the character of this proceeding?   Is it a criminal, civil or political one?

Sec. 4 Art. 2 of the U. S. Constitution declares : "The President, Vice President and all civil officers of the United States shall be *removed from office,* on impeachment, and conviction of treason, bribery or other *high* crimes and misdemeanors.

Article 196 of the Constitution provides: "The Governor, Lieutenant Governor, Secretary of State, Auditor, Treasurer, Attorney General, Superintendent of Public Education and the judges of all the courts of record in this State shall be liable to impeachment for *high* crimes and misdemeanors, for *nonfeasance* or *malfeasance in office,* for incompetency, for corruption, favoritism, *extortion* or *oppression in office ;* or for *gross* misconduct or habitual drunkenness."

Article 200 provides that "for *any of the causes specified in Article* 196, *judges* of the Court of Appeals, of the district courts throughout the State, and of the city courts of the parish of Orleans, may be *removed from office* by a judgment of the Supreme Court of this State," etc.; but such judgment shall not, as in case of impeachment, have the effect of disqualifying the respondent for office.

No prior Constitution designated the impeachable offenses *eo nomine.*

By the quoted provisions of our Constitution, this Court is given *concurrent, original* jurisdiction, with the Senate, of impeachable offenses and misdemeanors committed by those officers enumerated in Article 200.   Either impeachment or suit is a constitutional mode of removing constitutional officers from office.

The provisions of the State and Federal Constitutions are, essentially, the same.   The former is more specific as to what are impeachable crimes and misdemeanors.   The constitutional power of this Court is exactly commensurate with that of the Senate.   For whatever offenses the former may adjudge the latter may convict.   The evidence

to be adduced before each is the same.   The proceedings in each tribunal are of the same character.   The suit and impeachment must be grounded upon the commission of *some* high crime or misdemeanor enumerated, or upon some gross misconduct or habitual drunkenness.

In relator's brief, p. 2, we find the following, viz: " The question presented here is, as to the issue, whether or not your Honors have jurisdiction of acts committed by the defendant prior to his present term of office.   We alluded, in the oral argument, to the principle that the *courts, in such matters as the present, were bound by the precedents in impeachment trials.*   *   *   *   *   *The rules applicable to impeachable offenses are the same as those cognizable by judicial tribunals.*" The italics are ours.   See also p. 7, a similar paragraph.

Mr. Evarts, for respondent, on the Johnson impeachment trial, said : " You must have the crime *definite,* under the law and Constitution ; and, even then, it is not impeachable, unless you affect it with some of the public, general and important qualities that are indicated in the definition of the learned managers." P. 286, vol. 2.

Senator Johnson, in his official opinion, said : " That the term crimes and misdemeanors, in the quoted clause, mean *legal* crimes and misdemeanors, is further obvious, from the provisions contained in the third section of the first article of the Constitution, that, notwithstanding the judgment in the impeachment, the party is liable to indictment, trial, judgment and punishment according to law.   This proves that an officer can *only* be impeached for *acts for which he is liable to criminal prosecution.*

" Whatever acts, therefore, could not be criminally prosecuted under the general law, cannot be ground for impeachment."

On the impeachment trial of Lord Melville, in 1806, the opinion of the judges was required by the House of Lords, as to whether the charges against the respondent, of an improper withdrawal and use of funds entrusted to his care, as treasurer of the navy, were high crimes and misdemeanors within the law of England, and their answer was that they were not high crimes and misdemeanors.

Johnson's trial, vol. 3, p. 51 :

Mr. Nelson, for the respondent, argued that, in order to ascertain " what are impeachable crimes and misdemeanors, it is necessary to go to the common law for the definition ; and when you go to the common law for the definition, nothing is impeachable, in this country, within the meaning of the Constitution, except a crime or misdemeanor, known as such at the time the Constitution was adopted." 2 vol., p. 143.

Mr. Groesbeck said: "What is the issue before you? Allow me to say, it is not a question whether this or that *thing* were done. You are not here to try a mere *act*. By the very terms of the Constitution, you can only try, in this tribunal, *crime*. Let us repeat the jurisdiction— 'treason, bribery or other *high* crimes and misdemeanors.' The *jurisdiction is shut within that language,* and the issue that this Court can try is *only* an issue of *crime or no crime.*

"What is crime?

"In every grade of it, senators, there must be *unlawful purpose and intention.* When these are wanting there cannot be crime. There must be behind the act the *unlawful purpose* prompting its commission, otherwise there can be no crime." Vol. 2, p. 192.

Mr. Evarts concurred in the views expressed by Mr. Groesbeck, and in support of them quoted the opinion delivered by Lord Chancellor Thurlow on the trial of Warren Hastings:

"My lords, with respect to the laws and usage of Parliament, I utterly disclaim all knowledge of such laws. It has no existence.

"True it is, in times of despotism and popular fury, when to impeach an individual was to crush him by the strong arm of power, of tumult, or of violence, the laws and usage of Parliament were quoted in order to justify the *most iniquitous and atrocious acts.* But in these days of light and constitutional government, I trust that no man will be tried except by the laws of the land; a system admirably calculated to protect innocence and to punish crime.　\*　\*　\*

"I trust your lordships will not depart from recognized established laws of the land.

"The Commons may impeach, but your lordships are to try the cause; and the *same* rules of evidence; the *same* legal forms which obtain in the courts below will, I am confident, be observed in this assembly." 2 Vol., pp. 269 to 277.

Mr. Buchanan, chairman of the managers on the trial of Judge Peck, said: "Official misbehavior, therefore, in a judge, is a forfeiture of his office; but, when we say this, we have advanced only a small distance. Another question meets us: What is a *misdemeanor in office?* In answer to this question, and without pretending to furnish a definition, I *freely admit* we are bound to prove that the respondent has violated the Constitution and the known law of the land.

"This, I think, was the principle fairly deduced from all the arguments on the trial of Judge Chase and from the *votes of the Senate* on the articles of impeachment against him." Peck's trial, p. 427; Johnson's trial, Vol. 2, p. 287.

In his Commentaries on the Constitution, Mr. Justice Story says:

"The doctrine, indeed, would be truly *alarming*, that the common law did not regulate and control the powers and duties of the *court of impeachment*.

"What would, otherwise, become of the rules of evidence, the legal notions of crimes, and the application of principles of public or municipal jurisprudence, in the charges against the accused?

"It would be a *most extraordinary anomaly*, that while every citizen of every State, *originally composing the Union*, would be entitled to the common law, as his birthright, and at once his protection and his guide, as a citizen of the Union, he would be subjected to *no law*, to *no principle*, to *no rules* of *evidence*.

"It is the boast of English jurisprudence—and without it the power of impeachment would be an *intolerable grievance*—that, in trials by impeachment, the law *differs not* in essentials, for *criminal prosecutions before the inferior courts*.

"The same rules of evidence, the same notions of crimes and punishments, prevail." Sec. 798.

Again: "It seems to be the settled doctrine of the high court of impeachment that, though the common law cannot be a foundation of a jurisdiction not given by the Constitution and laws, that jurisdiction attaches, and is to be exercised according to the rules of the common law; and that, what are, and what are not, high crimes and misdemeanors, is to be ascertained by a recurrence to the great basis of American jurisprudence." Sec. 799.

Mr. Justice Blackstone says: "A crime or misdemeanor is an act committed or omitted, in violation of a public law, either forbidding or commanding it." 4 Black. p. 5.

"In the English law, misdemeanor is generally used in contradistinction to felony; and misdemeanors comprehend all indictable offenses which do not amount to felony, as perjury, battery, libel, conspiracy," etc.  *   *   *   *   "The word 'crime' has no technical meaning in the law of England. It seems, when it has reference to positive law, to comprehend those acts which subject the offender to punishment.

"When the words 'high crimes and misdemeanors' are used in *prosecution by impeachment*, the words '*high* crimes' have no definite signification, but are merely used to give *greater solemnity* to the charge." 4 Black. p. 5, and note.

This concordance of authority and precedent establishes conclusively that the terms "high crimes and misdemeanors," employed in the Federal as well as the State Constitutions, indicate *legal* crimes and

misdemeanors; and that an officer can *only* be impeached, or suit be brought against him, for amotion, for acts for which he is liable to *criminal prosecution,* under the principles of the common or statute law.

It further establishes that an officer cannot be tried in an impeachment tribunal for *acts,* but only for *crimes.* That the "jurisdiction is shut within" the language of the Constitution. That in every grade of crime there must be *unlawful purpose and intention* prompting its commission. When these are wanting there can be no impeachable crime or misdemeanor.

It further establishes that in impeachment trials, the same rules of evidence, the same legal forms, prevail as in other courts of the land; and that the respondent may claim the benefit of the rule in criminal cases that he may *only* be convicted, when the evidence makes the case clear, beyond a reasonable doubt.

It further establishes that misdemeanors in office are the violations of some known law of the land, and that in trials therefor, by impeachment, the law *differs not* in essentials from criminal prosecutions before the courts, and the same notions of crimes and punishments obtain therein. That the remedy and redress thereof, by impeachment, must be exclusively ascertained and exercised in conformity with these laws, which lie at the foundation of American jurisprudence.

This collation of authority and precedent was rendered imperative, by reason of there being no adjudicated case, to which we have been referred or that could, after diligent research, be found.

For the first time since the organization of the State government, this Court was given, by the Constitution of 1879, jurisdiction of such a proceeding as this; and this case is the first one that has been instituted under it.

II.

The next important question to be determined is : What are nonfeasance and malfeasance in office? What are corruption, favoritism, extortion and oppression in office?

We will treat of "*gross* misconduct" in a separate paragraph.

A statute of this State declares that "all crimes, offenses and misdemeanors shall be taken, intended and construed, according to and in conformity with, the common law of England." Another statute declares that any oppression, or extortion in office, is punishable; and that any one guilty of a misdemeanor in office, shall suffer fine or imprisonment. R. S. 976, 868, 869.

To ascertain what are the constituent elements of misdemeanor, extortion and malfeasance in office, the criminal law must be consulted.

For the same manner and character of evidence must be adduced as before the courts of *ordinary criminal jurisdiction*; and that this court, sitting on the trial of a suit for the amotion of a civil officer, jurisdiction of which is given thereto, by the same constitutional provisions, which confer upon the State Senate jurisdiction of impeachment trials, against same officer, must be governed thereby also.

Dr. Wharton, in the ninth edition of his criminal law, announces the following principles :

" It is a misdemeanor at common law for a public officer, in the exercise, or under the color of exercising, the duties of his office, to *abuse* any discretionary power with which he is invested by law, *from an improper motive.*" Sec. 1572.

" In an indictment against an officer of justice, for corrupt misbehavior, it is necessary that the act, imputed as misbehavior, be distinctly and substantially charged to have been done with *knowingly corrupt, partial, malicious* and *improper motives*, though there are no technical words required, in which the charge of corruption and knowledge shall be made." Sec. 1573.

" Malice, corruption, or evil intent, when essential to the case, may be inferred, as presumptions of fact from the evidence." Sec. 1590.

· In Mr. Bishop's recent edition of his work on Criminal Procedure, we find the following precepts laid down:

" In general, *corruption*, in some form of words, ought to be averred. It is believed to be always necessary in indictments at common law. It is commonly, if not always, so under statutes," etc. Vol. 2, sec. 834.

" The question of malice is for the jury. A sufficient presumption of it may arise from a *wrong act, intentionally done.* But a mistake of law, especially in a *judicial* officer, is *inadequate proof of corruption.*" Vol. 2, sec. 836; 2 Bishop's Crim. Law, secs. 966, 977.

" One serving in a *judicial,* or other capacity, in which he is required *to exercise a judgment of his own,* is not punishable for a mere error therein, or for a *mistake of the law.* His act, to be cognizable *criminally, or even civilly, must be wilful and corrupt.*" 1 Bishop's Crim. Law, secs. 460, 299.

" *Extortion,* in its general sense, signifies any *oppression* by color of right; but technically, it may be defined to be the *taking* of *money by an officer,* by reason of his office, either when none is due, or none is yet due." 2 Whar. Crim. Law, sec. 1574.

" But to extortion, at common law, and under most of the statutes, *corrupt motive is essential.* And if there be no such motive, and the

money be voluntarily given, for *extra* work, the indictment is not sustainable at common law." Ditto Sec. 1576.

"A mere agreement to pay is void, and will not sustain a charge of extortion." Ditto Sec. 1577.

The same principles are announced in Russell on Crimes, p. 135, 142.

Applying these principles, we find that a misdemeanor in office, or under color of an office, necessarily involves an *improper motive*, and the act must be done with *corrupt, malicious* or *improper intent*, or be infused from a wrong act, *intentionally* done.

We also find that extortion or oppression in office is the taking, by a civil officer, of money when none is due, or none is *yet* due, with a *corrupt* motive; but that a mere *agreement to pay money* will not sustain such a charge.

In such case, the question is not whether the act might be found correct upon full investigation; but did it proceed from *dishonest, oppressive* or *corrupt motive.*

To make out the charge of corruption, extortion or oppression in office, the proof must show an unlawful taking, by a public officer, by color of his office, of money, or some valuable thing, that is not due him. A promise to pay money to an officer is simply void.

### III.

The first specification in the complaint, epitomized, is that on the 3d of March, 1882, the respondent caused an order to be entered on the minutes of his court in the matter of the Succession of Nicholas Quiazzaro, directing the proceeds of property belonging thereto to be invested in bonds of the State, known as baby bonds, and thereafter procured a copy of same on same day and gave it to Charles E. Sel, and directed him to collect the balance of $291.54, to the credit of said succession in the hands of Ben Onorato, auctioneer, and offered him a reward for so doing; but on Onorato refusing a check on the presentation of said order, and same having been returned by Sel, respondent wrote on said copy at the foot thereof and before the seal of the court additional words, directing Onorato to pay said sum to bearer, to make said investment—said alteration having been made out of the presence of counsel and when court was not in session.

The further specification is made that, by the respondent's direction, Sel procured said balance in money and handed same to him—the respondent—and that he has never accounted therefor to the heirs, tutrix or other representative of the succession.

"And that said Lazarus thus illegally and *without any color of law or right, and in violation of his duty as a judge, obtained possession of the money* of said Quiazzaro-succession."

This charge and specification are susceptible of division into two heads, and each head may be separately considered:

1st. A charge of embezzlement or larceny of the money by respondent.

2d. The liability of the respondent to amotion for the taking and disposing of the money, although he may have been actuated by honest intentions and proper motives—upon the theory that the act was not a lawful one, and respondent was guilty of *"vicious* intromission" or its equivalent.

### IV.

In order to eliminate all unnecessary issues, we will first dispose of the charge of *"vicious* intromission" and intermeddling with the succession, pretermitting discussion for the present as to whether or not there was a succession, as a matter of law.

There is a law of this State on the subject, which furnishes the only correct guide in the premises. It is found in R. S. sec. 3685, which provides that "in case any person shall take possession of a vacant estate, or a part thereof without being duly authorized to that effect, *with the intent of converting same to his own use,*" he shall be liable to prosetion and punishment by fine, and made liable for the debts of the estate.

But when that statute was, in its revision in 1870, incorporated into the Civil Code, as Article 1100, that clause appertaining to criminal prosecution was omitted therefrom.

The history and interpretation of those statutes will be found in 12 Ann. 245, Walworth vs. Ballard ; 12 Ann. 344, Carl vs. Poleman ; 30 Ann. 949, Peet, Yale & Bowling vs. Nalle & Cammack ; 34 Ann. 326, Succession of Trosclair.

But civil liability cannot be enforced without proof of the intermeddler's *intent to appropriate* the effects of the succession. Unless such proof is administered the accused cannot be convicted. That is the *sine qua non.*

Germain to this is the further contention of relator's counsel that respondent is guilty of malfeasance in office, because he undertook the investment of the funds of the minor, without being thereto authorized by law.

The investment was authorized by the express terms of R. C. C. 348.

It is as follows: "The investment of the funds of the minor must be made by public act and secured by mortgage, *unless such investment be made in bonds* of the State, or in bonds for the payment of which the faith of the State of Louisiana stands pledged; and this investment shall *only*

be made under *decree of the court* having jurisdiction of the tutorship; nor shall such investment be changed, or *the bonds alienated*, except by a decree of same court, etc."

The investment in bonds cannot be made without a decree of court. This is a new article of the Code, and embraces the substance of the act of the 19th of March, 1857, but it makes an important addition thereto of the phrase, viz: "and this investment in bonds shall *only* be made under a *decree* of the court having jurisdiction of the tutorship."

Antecedent to the revision of the Code in 1870, a tutor was authorized to make such an investment in bonds by that statute; but, under the Civil Code of 1870, it was perfectly immaterial whether the tutrix was faithful or unfaithful to her trust, she was without legal authority to make an investment in bonds of the funds of her ward without a *decree of court.*

The funds were not, indeed, in the hands of the tutrix of Arsene Quiazzaro. They were in the judicial depository, and had been therein deposited to await the adjustment of the taxes and costs of selling the property of widow Quiazzaro, the proceeds of which the funds were; and on which the minor *only had a tacit mortgage*, postponed in rank to the liens of the State and city, and auctioneer.

The surplus of $291.54, now in controversy, was realized only by scaling the tax penalties and interest, and was quite as much under the control and destination of the respondent as that portion which had been expended on his orders previously made.

If there had been any serious doubt as to the rightfulness or propriety of the respondent's orders for the investment of the funds under the circumstances related herein, they were dispelled by the evidence of a leading member of the New Orleans bar, who testified on behalf of the relator. He said:

"In my answer to the question of the grand jury, in reference to the power of probate judges, I stated that, as a general rule, the tutor made the investment of minor's funds; that I considered *there were cases* when the minor's funds were in danger; when there was no tutor appointed to take charge of them; or when there were *other* circumstances which endangered the funds, I considered that the probate judge *might with propriety*, as a conservative measure, *direct the investment of the funds.*

"I stated in that conversation (with the respondent), that I recalled a case of my own, Judge Lea being on the bench, * * * and I stated that this case was one which occurred under Judge Lea's ad-

ministration, in which *I had been directed myself to make the invest-ment,"* etc.

Judge Lea became a member of this court in 1852, hence that occurrence happened prior to the enactment of the statute of March 19th, 1857.

If it was excusable in Judge Lea to authorize the attorney for the tutor to make the investment, why might not the respondent authorize the minute clerk of his court? The only difference consists in the choice of agents to effect the investment.

No importance should be attached to respondent's selection of one of several persons for the performance of the duty.

So far as the principle involved is concerned, it was quite immaterial whether respondent had selected the bank, the broker, or the attorney of the tutrix in lieu of his clerk.

## V.

But the point is made that the bonds in which the investment was made never reached their destination, and respondent is responsible on that account.

His counsel insist that the burden of proof was on relator to clearly establish that fact; and not having done so, a presumption is raised in favor of their safe delivery. That it was the duty of the relator to have introduced the tutrix, and to have shown by their testimony, their *non*-delivery *to them.*

The decisions are to that effect. "One who charges another with a *culpable omission* or *breach of duty* must prove the fact, *although it involves a negative.*" 90 S. 48; 3 N. S. 576; 2 Ann. 503; 6 Ann. 175; 13 Ann. 215.

"The burden of proof is on him who has to support his case by a fact, of which he is supposed to be most cognizant, and the evidence of which *is more within his power* than of his opponent." 11 O. S. 4, 194; 13 La. 534; 10 Ann. 639; 13 Ann. 379; 15 Ann. 509; C. C. 3.

"A fact material to the plaintiff's case, and susceptible of proof by him, he must prove, though negative in character." 14 Ann. 207, Bonus vs. Robichaux.

"The best evidence which, from the nature of the case, must be supposed to exist, and be within a *party's control*, must be produced." 8 N. S. 289; 5 R. 330; 9 R. 381; 2 Ann. 387.

The burden of proof was on the relator to establish the *non* delivery of the baby bonds to the tutrix or her attorney of record.

The further argument was made by relator's counsel to the effect

that there was no occasion for the respondent making the investment in $5 baby bonds, as he might have selected those of a greater denomination.

That is error. The debt ordinance authorized but one denomination of baby bonds, and that is $5. The ordinance relative to the State debt does authorize several denominations. But the baby bonds are the better security, because they bear a better rate of interest, mature at an earlier date, and enjoy a preference for other payment in taxes.

Further complaint is made of the respondent's failure to have the bonds registered by the State Auditor.

R. C. 384 only makes it the duty of the judge to make the necessary decree, and to restrict the negotiablity of the bonds.

But it makes it the *duty* of *the tutor* to furnish the Auditor * * * with a copy of the decree of court authorizing such investment, and to *cause* the bonds to be registered in the office of the Auditor.

It is provided by R. S. sec. 203 " that any tutor * * who shall fail to have the bonds, so purchased, registered and countersigned, * * shall be deemed guilty of a misdemeanor, and shall suffer fine and imprisonment."

As we have already held that, presumably, the bonds had reached the hands of the tutrix, that duty devolved upon her to have them registered.

VI.

This brings us to the discussion of the charge brought against the respondent of having stolen, or embezzled, the balance of $291 54, as the property of the succession of Nicholas Quiazzaro.

It is necessary to a clear understanding of the question that a brief statement of facts be made. Nicholas Quiazzaro died in 1868, and one Pioggio administered his succession, which was appraised at $29,752 97. His widow, Elizabeth Quiazzaro, qualified as natural tutrix for the three children, Ernestine, Gilbert and Arsene Adelaide.

In June, 1870, the administration was completed, final account filed, the administrator discharged, and the residue of $23,642 97 turned over to the tutrix.

In 1869 Widow Quiazzaro purchased, *in her own right*, the two improved lots, the balance of the proceeds of the sale of which is the subject of this controversy.

In 1870 the widow married a second husband, and thereby lost her usufruct of the children's share of the estate, and—notwithstanding she had been retained in the tutorship—she owed interest on same, $11,821 48, to them.

In February, 1881, the tutrix presented to respondent a petition in which she stated her indebtedness to her children and her desire to settle with them, and that she was *utterly destitute of means* outside of said property, and that *same was about to be sacrificed for taxes,* but that she could not effect a sale thereof without the *minor's tacit mortgage was raised,* and she desired the authority of a family meeting to that effect, *which, on proper proceedings, was granted.*

Respondent declined to homologate the deliberations thereof until a trusted expert had examined and reported the amount of taxes and costs of sale, which were found to be *in excess of the probable sale value* of the property. The taxes were adjusted and *reduced,* and sale was ordered on the terms proposed. The proceeds were deposited in the Branch Depository and disbursed on orders of court in payment of taxes and cost of sale, and the resulting balance is the $291.54 in controversy.

On the 3d of March, 1882, the following order was entered on the minutes of respondent's court, viz:

"More than six months having elapsed since the sale of the property in the above succession, and no opposition to the distribution of same having been made, and no one claiming any interest in the proceeds of said property other than the minor Quiazzaro,

"It is ordered that the proceeds of said property belonging to said Succession of Quiazzaro, be invested in bonds of the State known as baby bonds, and that said bonds be registered by the Auditor of the State, under R. C. C. 348."

It was in pursuance of this decree that the investment of the $291.54 was to be made.

Respondent, as witness in his own behalf, makes substantially the following statement of the transaction:

He says that he had forgotten about the Quiazzaro matter until F. A. Luminais, his minute clerk, invited his attention to it on the 2d of March, 1882, and suggested that the balance of about $200 should be invested under a previous order of court; and that on account of his suggestion he made the preceding order of the 3d of March, 1882. He states that on the same date, on his way to court, he called on Mr. Henry Bier, a bond broker, and induced him to make the investment without any commissions being charged therefor.

On that day he directed Mr. F. A. Luminais to make a copy of his decree and take it to Mr. Onorato, and get a check and go to Mr. Bier's and invest the amount of it in bonds, mentioning the arrangement he had made with him. He pleaded business, and suggested that

Charles E. Sel be sent in his place. He was given the copy of the order and sent to Onorato, who declined to give a check *until the order was made more specific, as it was.* Soon after, Mr. Sel returned with a roll of bills, which he handed to respondent, and which he immediately and without counting handed to Luminais, and requested him to go to Bier's and purchase the bonds.

He states that on the Monday morning following, the 6th of March, 1882, he inquired of Mr. Luminais if he had purchased the bonds, and he told him that he had, but had left them with Mr. Bier. On Tuesday morning, the 7th of March, 1882, he again made inquiry of Luminais for the bonds, and he again pleaded business, and suggested that Sel be sent; and he was dispatched for them, and procured them and brought them to court, and *delivered them to him* (respondent); and that he immediately handed them to Luminais, with instructions to verify or paraph them, and hand them to counsel for tutrix. Luminais requested some additional instructions in paraphing them, and that he withdrew one from the package and wrote an indorsement thereon as a guide, and Mr. Luminais took the package of bonds and walked out.

He states that he never examined or counted the bonds. That Mr. Sel said they were correct. He said he met Mr. John Lemonnier, counsel for the tutrix, a few days afterward, and notified him of Mr. Luminais being in possession of the bonds.

The books of Mr. Bier show that the amount actually invested was only $199 63, in lieu of $291 54. There was a deficit of $91 91 *unaccounted for by any one.*

The essential variations between the testimony of the respondent and that of Charles E. Sel are, viz :

1st. Sel swears that the respondent appointed him a custodian in that matter, and promised him a fee of $5.

2d. That when he collected Onorato's check, he counted the money paid him by the paying-teller; that he returned with the money to court and handed it to respondent, and that he put it in his pocket, he thinks.

3. That on the morning he was sent by respondent to Bier's for the bonds, he procured them and returned to court with them, and delivered them to the respondent ; and that he *handed them back to him* with the request that he should keep them for the present, saying : " You are custodian." That he took them and kept them several days, until the respondent called for them.

The testimony of Theodore Marks corroborates respondent's statements on the last two points, and contradicts that of Sel. The testi-

mony of Doran substantiates that of the respondent in regard to the surrender of the bonds to Luminais to paraph, and Marks, also.

Marks does not fix the precise date on which Sel brought the bonds to the respondent; but he details the circumstances of Sel being sent for the bonds, and of his return within *three-quarters of an hour* with them *and at once delivering* them to the respondent, and immediately going away—all on the same day, and about the same hour of the day.

Relator's counsel place strong reliance on the evidence of Sel. They state in argument that "the man who got the money used the $91; that the man who *bought* the bond used the $91. *The turning point in the case is*, who purchased the bonds? Whoever purchased the bonds did not invest the full amount of $291 54. If Luminais purchased the bonds he retained the money.

" If Judge Lazarus purchased the bonds then he retained the money. There is no escape."

It will be necessary to make an examination of the testimony, and the collateral facts, and transactions, in order to determine which witness has the stronger support— Sel or Marks.

Their testimony cannot be reconciled one with the other.

In speaking of his custody of the bonds he said, Miss Annie B. Fisher knew of his having them in possession. On interrogation, she said Mr. Sel called her attention to a roll he had in his pocket, one evening about 7 o'clock. " It was in March. I think about the 6th— first part of March. * * * He just lifted his coat to one side, and showed me the bonds; it was in the side pocket. * * * He simply said they were baby bonds.' * * *

" He said that he had them for Judge Lazarus; that *he had been sent to buy them for Judge Lazarus*."

This evidence was offered for the purpose of supporting Mr. Sel's custody of the bonds; but it supports respondent's theory, instead. It is in keeping with Mr. Bier's books, as to the date of purchase. It accounts for Luminais' reluctance to go, on Monday, the 6th, of March, for the bonds; and corroborates respondent's statement to the effect that Luminais stated to him, on that occasion, that the bonds had been purchased of Bier, but that he had left them.

If Luminais had received the money of respondent, as stated by him and Marks, on the 3d of March, and Sel had been sent to purchase the bonds for respondent, and had been by him purchased on the 6th of March and same were in his possession on that day, from what person could he have received the money other than Luminais?

If the money had not been delivered to Luminais, as related by respondent and Marks, but had, on the contrary, been retained by the respondent, as stated by Sel, at what time and place did Sel obtain it from respondent?

If, in point of fact, Sel had purchased, at Luminais' request, the bonds of Mr. Bier on the 6th of March, and had them in his possession on the evening of that day, was that not a good reason why Luminais should, on the morning of the 7th of March, have excused himself to respondent and requested that Sel be sent? Does not that condition of things harmonize with Mr. Upton's and Miss Fisher's statement; and yet be reconcilable with the statement of respondent and Marks? I think it does.

If Sel was the guilty party, the reason is- apparent why he so frequently consulted his friend, Mr. Upton, and appeared to have so much dread of the grand jury.

The same reason might be assigned why Sel so quickly understood the purport of an interview between Mr. Hart and Mr. Onorato, and influenced him to *intervene* therein so promptly.

On the contrary, relator's counsel argue that, on the 10th of February, 1882, respondent granted an order on Onorato, administrator, for the payment of $147 26 taxes, when none were due, and therefrom argue his guilt. Respondent disavows all knowledge of, or responsibility for this entry on the minutes. The books of the bank show the payment of that sum on February 11, 1882; but it is in possession of no voucher therefor, and why? Because the bank account with Onorato shows that the books of the bank were *balanced on that date*, and the vouchers for all payments made since last previous settlement—the 16th of September, 1881—had been withdrawn, including the one for $147 26 paid that day. The books were balanced on the 16th of September, 1881, and all previous orders withdrawn, including the one for $396 85, that represents the payment of the State taxes, with which Luminais had been specially entrusted by the respondent.

During this period of time Mr. Luminais was evidently in possession of the pass-book, or bank-book, in which the Quiazzaro account was kept. This is evidenced in a variety of ways:

1st. By the report of Garidel.

2d. By the negative testimony of Ben Onorato to the effect that *he did not keep one, and had not been furnished with one.*

3d. By the testimony of Doran, Cazelar and Johnson, who saw Luminais with it.

4th. By the report of Luminais himself, entered upon the minutes

in November, 1881, in which he carefully detailed the status of the account with the bank; and which he could not have known otherwise.

The Quiazzaro record appears to have been lost since December, 1881, when Mr. Sabourin took a *minute* inventory of its contents.

Upon an examination of it, when produced and offered in evidence, there were found the various reports made by Mr. Garidel, for the payment of taxes and costs and the attorney's fees of Mr. Lemonnier; but there was *no trace of the order* for *the payment of the* $147 26. *It had disappeared.*

An examination of the entries on respondent's court docket of February 10, 1882, show *no entry of any proceedings taken or order made in the matter of the Quiazzaro succession on that date.*

An examination of that particular entry on the minutes, as of the 10th of February, 1882, *discloses* an *ill-disguised alteration,* evidently made since the original execution, and the addition of the words, " *and still unpaid.*"

The fact was certainly well-known to Luminais, of all other persons, that all taxes had been paid, as his own report, entered on the minutes, will show. Is it not more likely that this fraud was perpetrated by him, and that those *words were employed as a means of concealment,* than that the respondent would have displayed such an order in the minutes, as a means of accomplishing a theft, when the minute clerk had himself paid those very taxes, and *to the respondent's knowledge.*

In connection with this state of circumstances may be considered the statement made by Doran, Cazelar and Johnson, to the effect that Luminais on another occasion spent the money of this succession he had withdrawn from the bank, to pay taxes, and had to borrow money of Johnson to supply the deficit, a month or two previous.

While these circumstances do not demonstrate that Mr. Luminais was guilty of the asportation of the $147 26, it creates a much stronger presumption against *him* than against respondent.

It certainly does not show that the respondent either received or converted same to his own use.

Luminais was discharged on the 17th of March, 1882, and subsequently died; and Mr. John LeMonier died of apoplexy on the——day of August, 1884.

There are some serious discrepancies in the testimony of Mr. Sel, which we will now review.

On cross-examination he was asked:

" Q.   Were you not sworn before the grand jury?

"A.   Yes, sir.

"Q.  Two grand juries?

"A.  Yes, sir.

"Q.  Did you state before either or both of those grand juries that you had those bonds in your possession?

"A.  Yes.

"Q.  From four to eight days?

"A.  Yes.

"Q.  Both of them?

"A.  To both of them."

Mr. W. W. Summer, who was foreman of the grand jury that assembled in the fall of 1886, states that when Mr. Sel came before the grand jury, he was apparently ill.  "He made his statement to *me and I repeated it word for word after him*.  His statement was:  That on the 6th of March, he was again called by Judge Lazarus and told to go up to Mr. Bier's and get some bonds, for the purchase of which Judge Lazarus had arranged.  That he went up to Mr. Bier's; was handed a package which, from its nature, he presumed contained bonds—in fact, he was certain of it; brought them back and handed them to Judge Lazarus, who was at the time in his private office, and *he went off about his business*."

He says that he is positive the question was asked Mr. Sel as to the day he delivered the bonds to Judge Lazarus.  Mr. Sumner says, on cross-examination:  "I recollect that in repeating the dates after him, *I particularly called his attention to the dates, and the fact of three days intervening between his being sent for the money and his being sent for the bonds, and he was asked about those dates, and he was positive* in regard to them.

"It was on the 6th of March that he delivered the bonds,

"Q.  It was on the 6th of March?

"A.  On the 6th of March that he delivered those bonds.

"Q.  That he delivered the bonds?

"A.  Yes, sir.

"Q.  Are you *sure* of that fact; or was it not an inference?

"A.  No, sir.

"Q.  From the fact that he said he had delivered the bonds, and you *thought* it was on *the same day?*

"A.  No, sir.

"Q.  You are sure of that?

"A.  Yes, sir; *I am positive about that.*

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"Q.  Did he make the statement that Mr. Stern testified to that that was *the last he had seen of the bonds?*

"A.   Yes, sir."

Mr. Stern, the clerk of the grand jury and who heard Mr. Sel's evidence, said :

" Mr. Sel stated that he went to Mr. Henry Bier's office; he got the bonds, and he showed us how they were wrapped up; in what shape they were, and stated that he handed them to Judge Lazarus in his office, and *and that was the last he had seen of the bonds.*"

On cross-examination Mr. Sel was asked :

" Q.   Were you not called upon last summer before myself (E. H. Farrar), and Mr. Parker, of the Picayune, and four or five newspaper reporters, and asked to give a statement of your connection with this matter ?

" A.   Yes, sir.

" Q.   Did you, on that occasion, make any statement about the length of time you had those bonds in your possession ?

" A.   No, sir.

" Q.   Why did you conceal it on that occasion ?

" A.   Well, I didn't think it was necessary.

" Q.   Were you not asked on that occasion to make a full and complete statement of your connection with the Quiazzarro matter, from beginning to end ?

" A.   Yes, sir.

᛫       *       *       *       *       *       *       *       *       *

." Q.   Mr. Sel, did you not, on that occasion, specifically state, in the presence of all those gentlemen, that you brought those bonds down to court and delivered them to Judge Lazarus *on the same day that the order was given you to get them ?*

" A.   Yes ; that is my impression.

" Q.   And that you did make that statement on that day ? "

" A.   Yes; I made that statement."

He made like admissions in regard to similar statements he had made to Mr. Denegre, Mr. Miller and Mr. Dinkelspiel.

There can be no doubt of the fact that Marks' evidence has been supported, and that of Sel seriously impaired by the evidence quoted.

The charge against the respondent of having embezzled these funds is not made out.

### VII.

Having disposed of all the charges which, in our opinion, involved either crime or misdemeanor, we will now discuss the remaining charges which may be considered as following under the denomination

of "gross misconduct," that is, culpable, offensive misconduct—equivalent to a *quasi* criminal act.

R. C. C. 3556, No. 13—Fault: "There are three degrees of faults: the gross, the slight, and the very slight fault.

The *gross* fault is that which proceeds from *inexcusable negligence; it is considered as nearly equal to fraud, etc.*

Beach on Contributory Negligence says:

"What is termed *gross* negligence the better authorities now call wilful negligence or wilful wrong-doing." P. 102.

The same author says: "By negligence is meant ordinary negligence, the significance of which is reasonably well fixed. By *gross* negligence is meant extraordinary negligence—that which is mere ordinary negligence in the superlative degree."

Unlike negligence, "misconduct" implies an act of the will, in the performance of an unlawful or wrongful act; and "*gross* misconduct" is a culpable, wilful, oppressive act, possessing a *quasi* criminal character.

The difference between "gross negligence" and "gross misconduct," is distinctly drawn in Milwaukee R. R. Co. vs. Ames, 91 N. S., 495.

"But the want of observance of the care, whether called *gross* or ordinary negligence, did not authorize the jury to visit the company with damages beyond the limit of compensation for the injury actually inflicted.

"To do this there must have been *some wilful misconduct,* or the entire want of care, which would raise the presumption of a *conscious indifference to consequences.*"

Judge Pickering was convicted on impeachment for drunkenness and profanity *while on the bench of his court.*

On the trial of Mr. Justice Chase, Manager Buchanan said: "I admit that if the charge against a judge be merely an *illegal decision,* or a question of *propriety* in a civil cause, his error ought to be *gross and palpable,* indeed, to justify the inference of a *criminal intention,* and to *convict* upon an impeachment," citing the case of Judge Pickering.

Mr. Blake, in discussing Judge Prescott's case defines misconduct thus:

"To misconduct is to misbehave; to misbehave is to misdemean; to misdemean is to be guilty of a misdemeanor—nothing more, nothing less. The term is technical, signifying a *crime;* hence, it follows, as a conclusion from these premises that misconduct and misbehavior, *in the legal interpretation, cannot be anything else.*" Johnson's Trial, Vol. 2, p 24.

All of the various other charges against the respondent fall under this *resumé* of authority and precedent.

The statement of them is quite sufficient, under the authorities cited, to defeat them, except, possibly, the cases of Martin vs. Aldige, and Hill vs. Chicago R. R. Co., which cannot be maintained under the evidence in the record; and relator admitted in argument that "the charges in reference to the Hill, Walshe & Woods cases would not have been sufficient to remove the respondent."

The charges have not been made out, and the demands of the relator, in my opinion, should be rejected.

I therefore dissent from the opinion of the majority of the court.